1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PBTM LLC,

Plaintiff,

v.

FOOTBALL NORTHWEST, LLC, *et al.*,

Defendants.

CASE NO.  C19-2081-RSM

ORDER RE: DEFENDANTS' MOTIONS
TO DISMISS AND PLAINTIFF'S
MOTION FOR LEAVE TO AMEND

## I.    INTRODUCTION

This matter comes before the Court on Defendants Football Northwest LLC and NFL Properties, LLC's Motions to Dismiss.  Dkts. #28, #30.  Plaintiff PBTM LLC ("PBTM") opposes Defendants' motions.  Dkt. #34.  PBTM has also moved for leave to amend its complaint, Dkt. #40, which Defendants have opposed.  Dkts. #42, #43.  The Court finds oral argument unnecessary to resolve the underlying issues.  Having reviewed the relevant briefing and the remainder of the record, the Court GRANTS IN PART Defendants' motions to dismiss as set forth below.

//

//

1

## II.    BACKGROUND

2

### A.  Factual Background

3    PBTM, previously known as Volume 12, LLC ("Volume 12"), is a Nevada limited

4   liability company.  PBTM brings this lawsuit against Defendants Football Northwest LLC

5   ("FBNW" or "the Seahawks") and NFL Properties, LLC ("NFLP").  The NFLP represents the

6   National Football League and its member clubs, including the Seahawks, for the licensing and

7   protection of the clubs' trademarks and other commercial identifications.  *Id.* at ¶ 13.

8    Since 2009, PBTM has developed and used markers incorporating the number 12 with

9   the word "VOLUME" or "V" in reference to Seahawks fans.  Dkt. #26 at ¶¶ 16-17.  The number

10  "12" refers to the Twelfth Man, a term used in American football to honor fans as the twelfth

11  member of the team, while "volume" references Seahawks fans' record-breaking crowd roar at

12  CenturyLink Field, the team's home stadium.  *Id.* at ¶ 28.   In June 1, 2009, PBTM began using

13  a styled number 12 in conjunction with the term "Volume" or "V," on produced products that

14  included towels, flags, banners and flyers.

15

16

17

18

19  *Id.* at ¶ 24.  PBTM later registered this mark with the USPTO on January 31, 2017, under

20  registered trademark No. 5,132,208.  *See* Dkt. #26-1 at 12.  PBTM created a website and

21  associated social media accounts, and its VOLUME 12 flags and banners were displayed across

22  Seattle bars and restaurants during the 2009 season.  PBTM alleges that for every home game,

23  VOLUME 12 banners were displayed prominently at CenturyLink Field, while Seahawks players

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 2

and management carried and were photographed with VOLUME 12 flags, banners and towels. PBTM claims that the Seahawks never objected to VOLUME 12 at any point during the 2009 season, but instead "genuinely created an association with VOLUME 12." Dkt. #26 at ¶ 24. Between 2009 and 2010, PBTM expanded its VOLUME 12 product line for use by other Seattle sports teams, including the Sounders, Mariners, Stealth, and University of Washington Huskies. *Id.* at ¶ 25.

In the first quarter of 2011, Seahawks management informed PBTM that they wanted the VOLUME 12 trademark to be associated exclusively with the Seahawks, and they did not want other Seattle sports teams using the mark. *Id.* at ¶ 26. On June 7, 2011, the Seahawks and PBTM entered into a license agreement ("the 2011 Agreement") that granted the Seahawks exclusive rights to use VOLUME 12 on stationery, signage, video boards and LED within the stadium and to promote and publicize VOLUME 12 "anywhere in the public domain" but only in conjunction with the sale of Seahawks jerseys. Dkt. #25-1. In return, PBTM received the "opportunity to capitalize on the publicity" created by the Seahawks' use of the mark. Dkt. #26 at ¶ 26.

From 2009 until 2011, the VOLUME 12 design remained the same on Seahawks banners and flags. In 2012, the Seahawks' graphic department developed new designs for the VOLUME 12 banners. *Id.* at ¶ 27. PBTM and the Seahawks "jointly selected a design" used on the team's end zone banners for the 2012 season. In June 2013, PBTM opened a VOLUME 12 commercial store in Redmond Town Center to sell Seahawks-related products. *Id.* at ¶ 28. PBTM claims that the Seahawks never protested PBTM's use of VOLUME 12 or claimed infringement related to the VOLUME 12 marks.

In 2014, PBTM and the Seahawks entered into negotiations for purchase of the VOLUME 12 trademark. *Id.* at ¶ 29. PBTM claims that the Seahawks ultimately declined to buy the

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND - 3

1   VOLUME 12 trademark when PBTM informed them "they needed at least $400,000 to recoup

2   their costs" to develop the mark.  *Id.*  The negotiations then turned to another PBTM trademark:

3   a stylized design of the phrase "LEGION OF BOOM."  General counsel for the Seahawks drafted

4   a purchase agreement for the trademark ("the LEGION OF BOOM Agreement"), which parties

5   signed on August 24, 2014.  Dkt. #25-2.

6          PBTM claims that parties did not discuss the VOLUME 12 mark during negotiations and

7   was therefore "surprised to see later drafts" of the LEGION OF BOOM Agreement that included

8   clauses about VOLUME 12.  *Id.* at ¶ 29.  PBTM claims that it specifically objected to paragraphs

9   21 and 22 and "wanted them deleted," since they contained language requiring PBTM to obtain

10  the Seahawks' consent prior to marketing a BOOM or VOLUME 12 product.  *Id.* at ¶¶ 29-30.

11  However, Seahawks management allegedly insisted that paragraphs 21 and 22 remain but

12  promised to modify the language so that PBTM would not be required to obtain the Seahawks'

13  consent prior to marketing a BOOM or VOLUME 12 product.  *Id.* at ¶ 30.

14         PBTM claims that notwithstanding parties' discussions about paragraphs 21 and 22, the

15  Seahawks did not revise paragraph 22 to remove the mandatory consent provision.  Dkt. #26 at

16  ¶ 30.  PBTM alleges that as a result of pressure from Seahawks management to immediately sign

17  the agreement, and because parties previously had a cordial working relationship, PBTM only

18  gave the execution version a "cursory review."  *Id.*  Consequently, it failed to notice that

19  paragraph 22 was not revised as PBTM requested and read as follows:

20             Given FBNW's rights and interest in the trademark "12," VOLUME
               12 LLC will not offer or market goods or services under "VOLUME
21             12" or any other mark containing "12" or "TWELVE" to or in
               connection with any team or any sport other than Seattle Seahawks
22             football. *Further, VOLUME 12 LLC shall seek and obtain prior
               written approval of FBNW before producing, advertising and/or
23             selling or otherwise distributing any product featuring a trademark
               that incorporates "12."*  It is understood that FBNW is under no

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

commitment to purchase, market or distribute "VOLUME 12"
goods or services.

Dkt. #25-2 at 6 (emphasis added). Shortly after signing, PBTM discovered that the Seahawks had omitted the language PBTM requested in paragraph 22 to make the Seahawks' consent non-mandatory, and PBTM "promptly protested this omission several times." Dkt. #26 at ¶ 30. Although the Seahawks reassured PBTM that its general counsel would add the "not mandatory" language to paragraph 22 to make the consent provision non-obligatory, the language was never added and the Seahawks have since refused to do so. As a result, PBTM contends, the sale of its "LEGION OF BOOM" mark was tied to a restriction on the use of its VOLUME 12 mark that PBTM never negotiated or agreed to. In May 23, 2016, PBTM asked for the Seahawks' consent for PBTM to use two VOLUME 12 designs that predated the LEGION OF BOOM Agreement, but the Seahawks refused. *Id.* at ¶ 37. PBTM later requested consent in 2017 for a "Turn the Volume UP to 12" mark, which the Seahawks again refused. *Id.* at ¶ 39.

PBTM claims that since execution of the 2014 LEGION OF BOOM Agreement, the Seahawks and NFLP have taken "inconsistent, but steady" challenges at the U.S. Patent and Trademark Office ("USPTO") to prevent PBTM from using its Volume 12 and V12 trademarks. *Id.* at ¶ 31. These efforts include filing an opposition in 2015 to PBTM's trademark applications for stylized "VOLUME 12" and "TURN UP THE VOLUME TO 12" marks, which Defendants later withdrew in 2016. *Id.* After withdrawing their opposition in the TTAB, NFLP sent a letter dated December 19, 2016, stating its belief that PBTM's use of these marks "without the permission of the Seahawks Club would violate the Legion of Boom Agreement, in addition to constituting infringement of the Seahawks Marks . . . ." *Id.* NFLP also reserved rights and remedies to future use of or application for Seahawks trademarks related to the number 12. *Id.*

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND - 5

1    In response to NFLP's December 19, 2016 letter, PBTM filed a petition to cancel the

2    Seahawks' trademark registration for No. 5084564, a styled number 12, in the Trademark Trial

3    and Appeal Board ("TTAB").[1]  Defendants moved to dismiss on the basis that the LEGION OF

4    BOOM Agreement deprived the USPTO of jurisdiction, since the provision applied to "the issue

5    of future trademark disputes."  *Id.* at ¶ 32 (quoting Dkt. #26-1 at 31).  PBTM subsequently

6    withdrew its Petition to Cancel, and the TTAB dismissed the matter without prejudice.

7         In 2016 and 2017, PBTM filed applications for its 2009 VOLUME 12 mark, reg. no.

8    5,132,208, and another VOLUME 12 mark that it first used in June 2012, reg. no. 5,132,113.  *See*

9    Dkt. #26-1 at 10-13.  Defendants did not file oppositions to these applications, and the marks

10   were registered on January 31, 2017.  *Id.*  However, in 2019, Defendants opposed PBTM's

11   registration application for a styled 12 mark that included a "V" and the phrase "verified property

12   of the fans," U.S. Serial No. 88477341 ("the Verified Property mark"):



16   Dkt. #26 at ¶¶ 14, 34.  In addition to opposing PBTM's use of the above mark, Defendants

17   obtained extensions to oppose three other pending registration applications from PBTM related

18   to "VOLUME 12" and "V12" marks.  *Id.* at ¶ 34.

19        At the same time Defendants opposed PBTM's registrations at the TTAB, the Seahawks

20   attempted to reach a settlement with PBTM that would have allowed PBTM to use the VOLUME

21

---

22   [1] The TTAB is an office of the USPTO that hears and decides adversary proceedings involving oppositions
     to trademark registration, petitions to cancel trademark registrations, and proceedings involving
23   applications for concurrent use registrations of trademarks.  *See* U.S. PATENT AND TRADEMARK OFFICE,
     *Trademark Trial and Appeal Board*, https://www.uspto.gov/about-us/organizational-offices/trademark-
24   trial-and-appeal-board (last updated November 18, 2019).

12 and V12 marks. *Id.* at ¶ 38. However, PBTM rejected the settlement terms as "unacceptable" because "they were intended to destroy . . . any association between the Seahawks and VOLUME 12 and V12." *Id.* After PBTM refused to sign the settlement agreement, the Seahawks' general counsel sent a letter to PBTM dated August 31, 2016 advising that PBTM's intent "to design, produce, advertise, distribute and/or sell products featuring a 12 would obviously be in violation of Paragraph 22 of the Legion of Boom Agreement and demonstrates PBTM's bad faith intent to violate the Seahawks intellectual property rights and/or misappropriate the goodwill inherent in the 12 Marks." *Id.* The letter further advised that the Seahawks would take "all steps necessary to protect its contractual rights and its valuable intellectual property rights." *Id.*

In 2017, PBTM attempted to cancel the 2011 Agreement that granted the Seahawks license to use VOLUME 12 within the stadium and anywhere in the public domain in conjunction with sale of Seahawks jerseys. *Id.* at ¶ 40. In a letter to Seahawks' counsel, PBTM explained that because the Seahawks refused to allow PBTM to use its VOLUME 12 mark, Defendants had denied PBTM the "opportunity to capitalize on the publicity" created by the Seahawks' use of the mark as provided in the 2011 Agreement. *Id.* Counsel for the Seahawks responded that the 2011 License Agreement was "in full force and effect" and that the Seahawks would continue to use VOLUME 12. *Id.*

Since 2018, PBTM has written and met with the Seahawks "several times" to try to resolve their dispute regarding paragraph 22 of the LEGION OF BOOM Agreement. *Id.* at ¶ 41. However, the Seahawks have only responded by filing oppositions at the TTAB, and maintain that PBTM can use their marks so long as there is no connection with the Seahawks. *Id.* In light of Defendants' actions, PBTM claims that it has a "real and reasonable apprehension" of future litigation to prevent PBTM from using the family of VOLUME 12 marks. *Id.* at ¶ 35. PBTM

1   claims that the Seahawks' behavior, in coordination with the NFLP, is "but one part of a larger

2   strategy to unfairly monopolize any intellectual property associated with the number 12." *Id.* at

3   ¶ 42.

4          On December 23, 2019, before PBTM's response was due in the TTAB Opposition

5   proceedings, PBTM filed this lawsuit. Dkt. #1. PBTM also moved to stay the TTAB proceedings

6   pending a final decision in this civil action, which the TTAB granted. *See* Dkt. #31-6 at 26.

7   PBTM has amended its complaint three times following meet and confer sessions among counsel

8   and filed its Third Amended Complaint on May 13, 2020. Dkt. #26.

9          PBTM's Third Amended Complaint alleges contract-related claims regarding the 2011

10  Agreement and the 2014 LEGION OF BOOM Agreement and federal and state antitrust

11  violations in the form of unlawful restraint of trade, unlawful monopolization and/or attempted

12  monopolization, and unlawful tying. *See* Dkt. #26 at ¶¶ 74-113. In addition to monetary

13  damages, PBTM seeks declaratory and injunctive relief declaring PBTM's right to use the

14  Verified Property mark, ordering the USPTO to dismiss Defendants' Opposition and issue a

15  trademark, and ordering Defendants to cease and desist from using five of their trademarks. *Id.*

16  at ¶¶ 65-73. Defendants move to dismiss PBTM's claims as time-barred and for lack of subject

17  matter jurisdiction, failure to state a claim, and *Noerr-Pennington* immunity. *See* Dkts. #28, 30.

18                     **III.    DISCUSSION**

19  **A. Legal Standards**

20         Federal Rule of Civil Procedure 12 allows a party to move for dismissal based on a lack

21  of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When a court lacks subject matter

22  jurisdiction, it lacks the power to proceed, and its only remaining function is to dismiss. *Steel Co.*

23  *v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Once

24

1 | the moving party has asserted lack of subject matter jurisdiction, the court will presume that there

2 | is no jurisdiction and the burden is on the party asserting jurisdiction to prove otherwise.

3 | *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391

4 | (1994).  "A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the

5 | pleadings or by presenting extrinsic evidence."  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d

6 | 1136, 1139 (9th Cir. 2003) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).

7 | In making a 12(b)(6) assessment, the court accepts all facts alleged in the complaint as

8 | true and makes all inferences in the light most favorable to the non-moving party.  *Baker v.*

9 | *Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted).

10 | However, the court is not required to accept as true a "legal conclusion couched as a factual

11 | allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)

12 | (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007)).  The complaint

13 | "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

14 | on its face." *Id.* at 678, 129 S.Ct. 1937.  This requirement is met when the plaintiff "pleads factual

15 | content that allows the court to draw the reasonable inference that the defendant is liable for the

16 | misconduct alleged." *Id.*  The complaint need not include detailed allegations, but it must have

17 | "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

18 | will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.  Absent facial plausibility, a plaintiff's

19 | claims must be dismissed. *Id.* at 570, 127 S.Ct. 1955.

20 | **B.  Request for Judicial Notice**

21 | The Seahawks have requested judicial notice of two categories of documents in support

22 | of their motion to dismiss.  Dkt. #32.  "Generally, on a 12(b)(6) motion, the District Court should

23 | consider only the pleadings." *Shaver v. Operating Engineers Local 428 Pension Trust Fund,* 332

24 |

1    F.3d 1198, 1201 (9th Cir. 2003).  However, the Court may consider "materials incorporated into

2    the complaint by reference, and matters of judicial notice." *New Mexico State Inv. Council v.*

3    *Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011).

4           The Seahawks move the Court to consider (1) documents filed with the USPTO, including

5    trademark registration applications and filings before the TTAB, and (2) copies of the 2011

6    Agreement and 2014 LEGION OF BOOM Agreement attached to PBTM's Third Amended

7    Complaint. Dkt. #32 at 3-4.  PBTM does not oppose the Seahawks' request.  *See* Dkt. #34.  The

8    first category of documents is judicially noticeable under Fed. R. Civ. P. 201 as public records

9    available through government agency websites.  *Gustavson v. Wrigley Sales Co.*, No. 12-CV-

10   01861-LHK, 2014 WL 60197, at *3 (N.D. Cal. Jan. 7, 2014).   The second category of

11   documents—copies of the 2011 Agreement and the 2014 LEGION OF BOOM Agreement—are

12   properly considered since PBTM attached them to its complaint.  *See*  Fed. R. Civ. P. 10(c) ("A

13   copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all

14   purposes").  Accordingly, the Seahawks' Request for Judicial Notice, Dkt. #32 is GRANTED.

15   **C. Contract-Related Claims (Counts 3-4)**

16          The Court will first address PBTM's breach of contract claims related to the 2014

17   LEGION OF BOOM Agreement and the 2011 Agreement.

18               i.   Count 3: LEGION OF BOOM Agreement

19          Count 3 claims that the Seahawks have breached the LEGION OF BOOM Agreement

20   since its execution on August 24, 2014, by failing to add the "not mandatory" language to

21   paragraph 22 as the Seahawks initially promised, by insisting that the Seahawks' consent be

22   mandatory prior to PBTM's use of the VOLUME 12 marks, and by refusing to grant PBTM

23   permission to use VOLUME 12 in association with the Seahawks.  Dkt. #26 at ¶¶ 74-82.  PBTM

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 10

1    further alleges that Defendants' conduct amounts to a breach of the implied duty of good faith

2    and fair dealing with respect to the LEGION OF BOOM Agreement.  In addition to damages for

3    breach of contract, PBTM seeks reformation of the LEGION OF BOOM Agreement to remove

4    the mandatory consent provision from paragraph 22.  *Id.* at 33.  For purposes of clarity, the Court

5    identifies PBTM's claims under Count 3 as Count 3a (reformation), Count 3b (breach of duty of

6    good faith and fair dealing), and Count 3c (breach of contract).

7                    1.   Count 3a: Reformation

8            Defendants move to dismiss PBTM's reformation claims under Count 3a as time-barred.

9    Dkt. #30 at 20.  The Court agrees.  Under Washington law, a party may seek reformation of a

10   contract if (1) the parties made a mutual mistake about the contract's terms; or (2) one party made

11   a mistake and the other party engaged in fraud or inequitable conduct.  *Wash. Mut. Sav. Bank v.*

12   *Hedreen,* 125 Wash.2d 521, 525, 886 P.2d 1121 (1994).  For the first circumstance involving

13   mutual mistake, Washington courts apply the six-year limitations under RCW 4.16.040 for

14   actions "upon a contract in writing, or liability express or implied arising out of a written

15   agreement."  RCW 4.16.040(1); *see Winmar Co. v. Teachers Ins. Annuity Ass'n,* 870 F. Supp.

16   524, 533 (S.D.N.Y. 1994) ("Although Washington law does not establish a statute of limitations

17   expressly applicable to reformation claims, Washington courts apply a six-year statute of

18   limitations to reformation claims at least to the extent that the claim is based on mutual mistake.");

19   *see also State ex rel. Pierce County*, 29 Wn.2d 37, 43, 185 P.2d 134 (1947) (Applying six-year

20   limitation period in "action for reformation of a contract based on mutual mistake.").  However,

21   for reformation based on *unilateral* mistake by one party and inequitable or fraudulent conduct

22   by the other, Washington courts apply the three-year limitations period under RCW 4.16.080 for

23   actions involving conversion, tort or relief based on fraud.  *See* RCW 4.16.080(4); *Browning v.*

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 11

*Howerton,* 92 Wash. App. 644, 650–51, 966 P.2d 367 (1998) (reformation based on fraud subject to three-year rule of RCW 4.16.080(4)).

Here, PBTM has plainly alleged the second circumstance of unilateral mistake.  *See* Dkt. #34 at 13 ("This case involves a unilateral mistake that Plaintiff made by signing the 2014 Agreement, believing that it contained the bargained-for language of 'not mandatory . . . .'").  For that reason, the three-year limitations bar applies to PBTM's claim for reformation of the LEGION OF BOOM Agreement.  Because the LEGION OF BOOM Agreement was signed on August 24, 2014 and PBTM discovered the discrepancy "[s]hortly after they signed," Dkt. #26 at ¶ 30, PBTM brought this action after the limitations period expired.

PBTM disputes the applicable limitations period, arguing that the three-year limitations period does not apply since it has not alleged fraud by the Seahawks—only inequitable conduct. *See* Dkt. #34 at 20 ("What the Complaint describes . . . is this unilateral mistake brought about by FNW's inequitable conduct--- not fraud.  As such, the tort statute of limitations for fraud does not apply.").  PBTM's position is unsupported.  Where a plaintiff alleges breach of an affirmative duty to disclose a material fact, Washington courts apply the three-year limitations period for claims grounded in fraud—regardless of whether the plaintiff expressly pleads fraud or merely alleges breach of the duty of affirmative disclosure.  *See Crisman v. Crisman*, 85 Wash. App. 15, 21, 931 P.2d 163, 166 (1997), *as amended on denial of recons.* (Feb. 14, 1997) ("The plaintiff may affirmatively plead and prove the nine elements of fraud *or may simply show that the defendant breached an affirmative duty to disclose a material fact*. . . . Either method of proof will activate the statutory discovery rule for fraud, RCW 4.16.080(4).") (internal citations omitted) (emphasis added).  Breach of the affirmative duty to disclose a material fact is precisely what PBTM alleges here: "A party engages in fraud or inequitable conduct if it conceals a material

1   fact from the other party when it has a duty to disclose that fact to the other party. . . .  These

2   factors are present in this case."  Dkt. #34 at 19.  Accordingly, having pleaded unilateral mistake

3   and inequitable conduct by the Seahawks, PBTM cannot avoid the three-year limitations period.

### 2.   Count 3b: Breach of Duty of Good Faith and Fair Dealing

5         PBTM alleges that the Seahawks breached the implied duty of good faith and fair dealing

6   in the LEGION OF BOOM Agreement by (a) inserting a restriction into paragraph 22 that PBTM

7   never agreed to and refusing to revise it; (b) refusing consent to PBTM to use their trademarks;

8   (c) threatening to sue for infringement; (d) proposing a settlement agreement with unacceptable

9   conditions; and (e) filing oppositions at the TTAB.  Dkt. #26 at ¶¶ 30, 36-39, 41.

10        As an initial matter, most of these claims are barred by the three year statute of limitations.

11  PBTM argues that a six-year limitations period applies given that they are "tied to a breach of

12  contract claim," Dkt. #34 at 21, but the Court has previously considered and rejected this

13  argument.  *See Nichols v. Fed. Deposit Ins. Corp.,* No. C14-1796RSM, 2016 WL 696389 (W.D.

14  Wash. Feb. 22, 2016)  ("[T]his Court has previously determined that such claims, although arising

15  out of the contract at issue, are subject to a three-year statute of limitations.") (citing *Pruss v.*

16  *Bank of Am. NA,* No. C13-1447 MJP, 2013 WL 5913431, at *5 (W.D. Wash. Nov. 1, 2013)).

17  PBTM argues that the *Nichols* decision is inapplicable, because it was reached "with little

18  analysis" and "no Washington state court has ruled on the applicable statute of limitations for a

19  breach of the duty of good faith and fair dealing."  Dkt. #34 at 21.  The Court disagrees.  The

20  *Nichols* decision relied on the well-reasoned analysis in *Pruss*, which concluded that "breach of

21  the duty of good faith and fair dealing claims are subject to a three year statute of limitations."

22  2013 WL 5913431 at *5 (citing RCW § 4.16.080).  Furthermore, Washington courts have

23  considered the matter and applied the three-year limitations period to fair dealing claims.  *See*

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 13

1   *Steinberg v. Seattle-First Nat. Bank*, 66 Wash. App. 402, 404, n.4, 832 P.2d 124, 125 (1992).

2   Based on this case law, the Court finds no support for applying the six-year limitations period to

3   PBTM's claims for breach of duty of good faith and fair dealing.  Accordingly, PBTM's fair

4   dealing claims based on events that occurred prior to December 23, 2016 are time-barred, as they

5   fall outside the 3-year limitations period.

6          Nevertheless, the Court observes that several of PBTM's claims allege fair dealing

7   violations based on Seahawks conduct that took place within the applicable limitations period.

8   These actions include refusals of consent to use the VOLUME 12 trademarks in 2017 and 2018

9   and oppositions filed at the TTAB in 2018 and 2019.  *See* Dkt. #26 at ¶¶ 39, 40-41.  Because the

10  Seahawks' Motion to Dismiss relies exclusively on the time bar as a basis for dismissing PBTM's

11  fair dealing claims, *see* Dkt. #30 at 21-22; the Court declines to dismiss PBTM's claims for breach

12  of duty of good faith and fair dealing that fall within the 3-year limitations period.

13                          3.   Count 3c: Breach of Contract

14         Lastly, PBTM brings claims for breach of the LEGION OF BOOM Agreement that are

15  subject to a six-year statute of limitations period and thus not time-barred.  *See* RCW 4.16.040(1).

16  To the extent these breach of contract claims rely on a reformed version of the LEGION OF

17  BOOM Agreement, *see* Dkt. #26 at ¶¶ 76-77, these claims automatically fail given that

18  reformation of the agreement is time-barred.

19         PBTM also alleges breach of contract based on the as-written language of the LEGION

20  OF BOOM Agreement.  Specifically, PBTM claims that the Seahawks breached paragraph 22 by

21  refusing PBTM permission to use VOLUME 12 in association with the Seahawks.  *Id.* at ¶ 79.

22  While these claims are not time-barred, the Court nevertheless finds PBTM's claim facially

23  implausible.  The contractual language relied upon by PBTM reads: "Given FBNW's rights and

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 14

1   interest in the trademark '12,', VOLUME 12 LLC will not offer or market goods or services under

2   "VOLUME 12" or any other mark containing '12' or 'TWELVE' to or in connection with any

3   team or any sport other than Seattle Seahawks football." Dkt. #25-2 at 6.  PBTM urges the Court

4   to read the sentence—specifically the phrase "other than Seattle Seahawks football"—as

5   imposing a duty on the Seahawks to sometimes or always permit PBTM to use the V12 family

6   marks. Dkt. #34 at 19; *see also* Dkt. #26 at ¶ 79.  However, the quoted sentence expressly imposes

7   a duty on PBTM to limit use of V12 marks to associations with the Seahawks.  It contains no

8   mention of any corresponding duty on the Seahawks to grant permission to use the marks.  "A

9   breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the

10   breach proximately causes damage to the claimant."  *Nw. Indep. Forest Mfrs. v. Dep't of Labor*

11   *& Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995).  By failing to plausibly allege a duty imposed

12   on the Seahawks by the LEGION OF BOOM Agreement, PBTM has not pleaded sufficient facts

13   to support a breach of contract claim.

14          Having concluded that PBTM's reformation claims (Count 3a) and breach of contract

15   claims (Count 3c) are time-barred or facially implausible, the Court grants dismissal of these

16   claims.  Because PBTM has alleged some claims under the breach of duty and fair dealing (Count

17   3b) that are not time-barred, the Court grants in part Defendants' motion to dismiss as to the

18   time-barred claims and denies dismissal of the remaining claims arising on or after December 23,

19   2016.

20          ii.  Count 4: the 2011 Agreement

21          Count 4 of the Third Amended Complaint claims that since execution of the LEGION OF

22   BOOM agreement on August 24, 2014, the Seahawks have breached provisions in the 2011

23   Agreement granting PBTM the "opportunity to capitalize on the publicity created by the

24

1 | Seahawks use of the Mark" and allowing PBTM to "retain all of the rights to the Mark not granted

2 | in this Agreement."  Dkt. #26 at ¶¶ 84-85.  Defendants move to dismiss claims under Count 4

3 | based on contract law principles.  Dkt. #30 at 22.

4 |       Defendants cite the well-established principle that where the terms of a later contract—

5 | agreed to by the same parties on the same subject matter—are inconsistent with the terms of an

6 | earlier contract, the later contract supersedes the former.  *See Arredondo v. Sw. & Pac. Specialty*

7 | *Fin., Inc.*, No. 118CV01737DADSKO, 2019 WL 4596776, at *6 (E.D. Cal. Sept. 23, 2019)

8 | ("[W]ell-settled principles of contract law dictate that a previous contract is superseded by a

9 | subsequent one by the same party on the same issues.") (citing *N. L. R. B. v. Int'l Union of*

10 | *Operating Engineers Local No. 12, AFL-CIO* 323 F.2d 545, 548 (9th Cir. 1963)).  This principle

11 | is recognized under Washington law.  *See In re Estate of Bachmeier*, 147 Wash. 2d 60, 66, 52

12 | P.3d 22, 24–25 (2002) ("When two contracts are in conflict, the legal effect of a subsequent

13 | contract made by the same parties and covering the same subject matter, but containing

14 | inconsistent terms, is to rescind the earlier contract.") (citing *Higgins v. Stafford,* 123 Wash.2d

15 | 160, 165–66, 866 P.2d 31 (1994)).  Thus, the question before the Court is whether, as a matter of

16 | law, PBTM may bring a breach of contract claim predicated on the terms and enforcement of an

17 | allegedly inconsistent subsequent contract.  In light of the above-referenced contract principle,

18 | the Court concludes that it cannot.

19 |       Here, PBTM and Defendants do not dispute that the contracts are between the same

20 | parties.  However, PBTM argues that the agreements dealt with separate subject matter.  Dkt. #34

21 | at 22.  PBTM's argument is untenable.  The Third Amended Complaint plainly alleges that

22 | paragraph 22 of the LEGION OF BOOM Agreement granted the Seahawks control over the

23 | VOLUME 12 mark.  *See* Dkt. #26 at ¶ 30 ("PBTM never agreed to give the Seahawks total control

24 |

1    over their use of their valuable trademark, VOLUME 12, as part of the sale of the LEGION OF

2    BOOM mark.  However, that is the result of Paragraph 22's mandatory consent requirement.").

3    PBTM's argument that "[t]he 2014 Agreement . . . said nothing about FNW's right to license

4    VOLUME 12 or FNW's continued ability to use VOLUME 12" therefore contradicts the

5    gravamen of its breach of contract claim.  Either the two contracts "concern the same subject

6    matter so that the two cannot stand together," or they address separate subject matter and do not

7    conflict.  *Wittco Sys., Inc. v. Gene Juarez Salons, Inc.*, 109 Wash. App. 1006 (2001) (quoting

8    *Sherman v. Sweeny,* 29 Wash. 321, 69 P. 1117 (1902)).  Furthermore, the entire agreements need

9    not conflict in order for the principle of superseding contracts to apply.  Rather, "the later contract

10   supersedes the former contract *as to inconsistent provisions*."  *N. L. R. B.*, 323 F.2d at 548

11   (emphasis added); *see also Beroth v. Apollo Coll., Inc.*, 135 Wash. App. 551, 563, 145 P.3d 386,

12   393 (2006) ("When two contracts are interpreted together, the later one prevails on terms that are

13   inconsistent; all consistent terms of the first contract remain in force.").  For that reason, the fact

14   that each contract contains some subject matter not addressed in the other contract does not bar

15   operation of the principle of superseding contracts.

16       PBTM also argues that *Arredondo* is inapplicable here, since that case dealt with

17   agreements where "[i]t was clear that the latter agreement was intended to supersede the former

18   . . . ."  Dkt. #34 at 22.  However, under Washington law, express intent is not required for

19   inconsistent provisions in a subsequent contract to supersede the original contract.  Rather, if "the

20   second agreement does not explicitly state whether or to what extent it operates to discharge or

21   substitute the first, the two agreements are interpreted together."  *Beroth*, 135 Wash. App. at 563,

22   145 P.3d 386 (citing *Flower v. T.R.A. Indus., Inc.,* 127 Wash. App. 13, 29, 111 P.3d 1192 (2005),

23   *review denied,* 156 Wash.2d 1030, 133 P.3d 474 (2006)).  The subsequent contract then "prevails

24

1   on terms that are inconsistent." *Id.*   Taking PBTM's claims as true, paragraph 22 therefore

2   prevails over the earlier, inconsistent provisions in the 2011 agreement.

3        Lastly, PBTM argues that a statement by the Seahawks general counsel precludes

4   Defendants from arguing that PBTM's claims fail under principles of contract law.   Dkt. #34 at

5   21.   Specifically, PBTM claims that a 2017 letter written by the Seahawks' general counsel

6   asserted that the 2011 Agreement remains in "full force and effect."   *Id.*   The Court finds no

7   support for PBTM's proposition that a statement made by the Seahawks' general counsel in a

8   2017 letter precludes Defendants from raising certain arguments in the instant litigation.   PBTM

9   cites *Samsung Elecs. Co. v. Panasonic,* 747 F. 3d 1199, 1202 (9th Cir. 2014).   *See* Dkt. #34 at 22.

10  However, it provides no explanation of how *Samsung* supports its position, nor can the Court

11  discern the case's relevance to PBTM's argument.   For these reasons, the Court finds that PBTM's

12  claims under Count 4 fail as a matter of law.

13       **D.  Antitrust Claims (Counts 5-8)**

14        In Counts 5 through 8, PBTM alleges that Defendants' anti-competitive conduct violates

15  antitrust laws under Sections 1 and 2 of the Sherman Act and parallel state law.   Dkt. #26 at ¶¶

16  43-57.   Specifically, PBTM claims that Defendants' actions create an unlawful monopoly or

17  attempted monopoly that unreasonably restrain trade in violation of Section 2 of the Sherman Act,

18  5 U.S.C. § 2 (Count 5) and Washington state law, RCW § 19.86.040 and Wash. Const. Art. 12 §

19  22 (Count 6).   *Id.* at ¶¶ 88-98.   PBTM further alleges that Defendants intentionally conspired to

20  take, have taken, and continue to take concerted action to unlawfully and unreasonably restrain

21  trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count 7), and Washington state

22  law, RCW 19.86.030 (Count 8).   *Id.* at ¶¶ 99-107.   Defendants move to dismiss PBTM's antitrust

23

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 18

claims based on *Noerr-Pennington* immunity, timeliness, and failure to state a claim.  Dkts. #28, 30.  The Court will address each argument in turn.

       i.   *Noerr-Pennington* Immunity

     Defendants assert immunity to PBTM's antitrust claims under a doctrine first recognized in two antitrust cases, *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), which is now generally known as the *Noerr–Penington* doctrine.  The *Noerr–Pennington* doctrine insulates from liability "petitioning conduct."  *Theme,* 546 F.3d at 1006.  Petitioning conduct includes the filing of a "reasonably based but unsuccessful lawsuit," *Sosa,* 437 F.3d at 930, as well as conduct "incidental to a lawsuit, including a pre-suit demand letter," so long as it does not fall into the realm of "sham litigation."  *Theme,* 546 F.3d at 1007.  Courts in the Ninth Circuit have extended the doctrine to claims arising out of enforcement activity at the TTAB.  *See Entrepreneur Media, Inc. v. Dermer*, No. SACV181562JVSKESX, 2019 WL 4187466, at *3 (C.D. Cal. July 22, 2019) ("[C]ourts within this Circuit . . . have routinely found that such activities are clearly protected.") (collecting cases).

     To defeat immunity under the *Noerr–Pennington* doctrine, the non-moving party must show that the moving party's efforts to protect its legal rights were a "sham." *Hard 2 Find Accessories, Inc. v. Amazon.com, Inc.*, No. C14-0950 RSM, 2014 WL 6452173, at *2–3 (W.D. Wash. Nov. 17, 2014), *aff'd sub nom. Hard2Find Accessories, Inc. v. Amazon.com, Inc.*, 691 F. App'x 406 (9th Cir. 2017).  A "sham" lawsuit is one where the suit is both "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and "an attempt to interfere directly with the business relationship of a competitor through the use of the

1  governmental process—as opposed to the outcome of that process." *Rock River Communs., Inc.*

2  *v. Universal Music Group, Inc.,* 745 F.3d 343, 351–52 (9th Cir. 2014) (internal citations omitted).

3       The Court finds that PBTM has pleaded facts sufficient to allege a "sham" defense to

4  PBTM's *Noerr–Pennington* immunity.  PBTM claims that Defendants' 2016 Opposition, which

5  raises the same theories now asserted  in the 2019 Opposition, was withdrawn by Defendants and

6  dismissed with prejudice by the TTAB.  Dkt. #26 at ¶ 31.  Furthermore, PBTM claims that the

7  2019 Opposition is objectively baseless based on (1) obvious visual differences between the mark

8  PBTM seeks to register and the marks the Seahawks claim it infringes on; (2) the lack of

9  superiority of the Seahawks' marks; (3) Defendants' failure to provide supporting records, reports

10  or evidence of customer confusion with their Opposition; and (4) the trademark at issue is "based

11  solely on the use and style of the number 12, which appears in PBTM's prior registered marks"

12  and therefore "will not cause any additional harm to the Defendants than they would experience

13  from PBTM's lawful use of the prior registered marks." *Id.* at ¶¶ 5, 19-20, 49.  Without reaching

14  the merits of PBTM's claims, the Court finds that PBTM has set forth more than "conclusory"

15  allegations that Defendants' Oppositions filed at the TTAB are a sham.  *Cf. In re Gilead Scis.*

16  *Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (Court not required to accept as true "allegations

17  that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").  For

18  this reason, the Court declines to dismiss PBTM's antitrust claims based on *Noerr-Pennington*

19  immunity at this stage of the case.

20       ii.   Timeliness

21       Private federal antitrust actions are subject to a four-year statute of limitations from the

22  date the cause of action accrues under 15 U.S.C. § 15b.  *Samsung Electronics Co., Ltd.,* 747 F.3d

23  at 1202.   The limitations period for antitrust violations under the Washington Consumer

24

1   Protection Act ("WCPA") is likewise four years, RCW 19.86.120, and Washington courts look

2   to federal law when interpreting these antitrust provisions of the WCPA.  *See Boeing Co. v.*

3   *Sierracin Corp.*, 738 P.2d 665, 677 (Wash. 1987) ("The Legislature intended the [Consumer

4   Protection] Act to complement federal antitrust laws and, in construing the Act, we are guided by

5   federal decisions dealing with the same or similar matters.").  Under federal antitrust law, "a cause

6   of action accrues . . . when a defendant commits an act that injures a plaintiff's business." *Zenith*

7   *Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

8   However, there is an exception to this limitations rule for continuing violations. *Samsung,* 747

9   F.3d at 1202.  "To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff

10  must allege that a defendant completed an overt act during the limitations period that meets two

11  criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous

12  act; and 2) it must inflict new and accumulating injury on the plaintiff.'" *Id.* (quoting *Pace Indus.,*

13  *Inc. v. Three Phoenix Co.,* 813 F.2d 234, 238 (9th Cir.1987)).

14          Parties agree that the LEGION OF BOOM Agreement, executed in 2014, was entered into

15  outside the statute of limitations period.  However, parties disagree on whether an exception to

16  the four-year limitations period applies here under the continuing limitations doctrine.  PBTM

17  argues that Defendants' recent efforts to enforce the LEGION OF BOOM Agreement, including

18  filing the 2019 oppositions with the TTAB, are new and independent acts that inflict new and

19  accumulating injury on PBTM. Dkt. #34 at 28.  Defendants counter that their subsequent conduct

20  merely reaffirms the terms of the 2014 agreement and does not inflict any new injury.  Dkt. #36

21  at 11.  For the reasons set forth below, the Court agrees with PBTM that the continuing violation

22  doctrine applies, and Counts 5-8 are not time-barred.

23

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 21

Active enforcement of agreements entered into outside the limitations period may constitute "new and independent acts" that inflict new and accumulating injury. In *Columbia Steel Casting Co. v. Portland General Elec. Co.*, the Ninth Circuit considered a power company's refusal to sell power to a plaintiff under an 18-year-old horizontal market share division agreement. 111 F.3d 1427 (9th Cir. 1996). The Ninth Circuit concluded that the company's refusal was a new and independent act because the original agreement "was not a permanent and final decision that controlled the later act." *Id.* at 1444. Similarly, in *Hennegan v. Pacifico Creative Service, Inc.*, the Ninth Circuit found that tour operators diverting customers from plaintiffs' souvenir shop constituted continuing violations, despite the fact that the tour operators had initially agreed to divert customers from plaintiffs' shop outside the limitations period. 787 F.2d 1299 (9th Cir. 1986). Again, the Ninth Circuit concluded the original agreement "did not immediately and permanently destroy the plaintiff's business, nor [was it] irrevocable, immutable, permanent and final." *Id.* at 1301 (internal quotations omitted).

In contrast to *Columbia Steel* and *Hennegan*, courts have declined to find a continuing violation where the initial agreement, entered into outside the limitations period, "completely and permanently excluded [the plaintiff] from the market." *Hennegan,* 787 F.2d at 1301. Such is the case in *In re Multidistrict Vehicle Air Pollution* ("*AMF*"), which addressed four automobile manufacturers who collectively refused to buy afterburners from the plaintiff and agreed to manufacture their own. 591 F.2d 68 (9th Cir. 1979). In declining to apply the continuing violations doctrine, the Ninth Circuit reasoned that the manufacturers' initial decision, made outside the limitations period, eliminated the market for plaintiff's car afterburners due to the considerable lead time required to integrate afterburners into new cars. *Id.* at 72. Consequently, because defendants' decision effectively excluded plaintiff from the afterburner market, the

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND - 22

1 | manufacturers' initial decision to not buy from plaintiff was "irrevocable, immutable, permanent,

2 | and final." *Id.* at 72.   The line of cases relied upon by Defendants follow similar facts as *AMF*,

3 | where defendants' subsequent refusals to trade were merely "reaffirmation[s] of the original

4 | decision not to deal with the plaintiff." *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 938

5 | (9th Cir. 1981); *see also Garrison v. Oracle Corporation*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016)

6 | (Hiring new employees and suppressing their salaries were not "new and independent acts" from

7 | the original anticompetitive agreement between Oracle and technology companies not to poach

8 | employees from one another).

9 |      The Court finds that the LEGION OF BOOM Agreement is more similar to the *Columbia*

10 | *Steel* and *Hennegan* line of cases, given that execution of the agreement did not "immediately and

11 | permanently destroy" PBTM's ability to market the trademarks or "completely and permanently

12 | exclude" them from the market. *Hennegan*, 787 F.2d at 1301.   The LEGION OF BOOM

13 | Agreement does not provide that Defendants will always refuse to grant PBTM consent to use the

14 | marks or always oppose its registration applications at the TTAB.   Indeed, to PBTM's point,

15 | Defendants have inconsistently opposed trademark registration at the TTAB and allowed

16 | registration of certain trademarks. *See id.* at ¶ 33 (PBTM registered two trademarks in 2016

17 | without opposition from Defendants).   PBTM's efforts in 2016 to secure the Seahawks' consent

18 | were therefore not "forlorn inquiries by one all of whose reasonable hopes had been previously

19 | dashed." *AMF*, 591 F.2d at 73.   Consequently, while the 2014 contract incrementally limited

20 | PBTM's ability to market the V12 products, it did not permanently exclude PBTM or destroy its

21 | business as did the agreements in *Orgell* and *Garrison*.   Rather, the scheme required later action

22 | by Defendants, such as withholding consent and opposing registration at the TTAB based on the

23 | LEGION OF BOOM Agreement, in order to inflict injury.

24 |

1    For these reasons, the Court finds that Defendants' later withholding of consent comprise

2    continuing violations within the applicable limitations period.

3         iii.    <u>Failure to State a Claim</u>

4         Having found that Counts 5-8 are timely, the Court will consider whether PBTM has

5    sufficiently alleged antitrust claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-

6    2, and their state law analogues, RCW 19.86.030 and 19.86.040.  To survive a motion to dismiss,

7    an antitrust complaint "need only allege sufficient facts from which the court can discern the

8    elements of an injury resulting from an act forbidden by the antitrust laws." *Newman v. Universal*

9    *Pictures,* 813 F.2d 1519, 1522 (9th Cir.1987), *cert. denied,* 486 U.S. 1059 (1988).  The Court's

10   analysis of PBTM's federal antitrust claims extends to its state law claims under the WCPA,

11   which are patterned after Sections 1 and 2 of the Sherman Antitrust Act.  *State v. Black*, 100

12   Wash. 2d 793, 799, 676 P.2d 963, 967 (1984); *see also* RCW 19.86.920 ([I]n construing [the

13   WCPA], the courts [shall] be guided by final decisions of the federal courts and final orders of

14   the federal trade commission interpreting the various federal statutes dealing with the same or

15   similar matters . . . .").

16        Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust

17   or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with

18   foreign nations . . . ." 15 U.S.C. § 1.  To state a claim under Section 1, a plaintiff must allege (1)

19   a contract, combination, or conspiracy between two or more entities; (2) in unreasonable restraint

20   of trade; that (3) affects interstate commerce.  *See id.*; *Am. Ad. Mgmt., Inc. v. GTE Corp.*, 92 F.3d

21   781, 788 (9th Cir. 1996).  A Section 1 plaintiff must sufficiently plead a restraint of trade that

22   falls under one of three rules of analysis: rule of reason, per se, or quick look.  While courts

23   typically need not decide which standard to apply at the pleading stage, they must still determine

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 24

1   whether the complaint has alleged sufficient facts to state a claim under at least one of these three

2   rules.  *See In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal.

3   2012) ("Indeed, that decision is more appropriate on a motion for summary judgment.").

4        The rule of reason is the presumptive, default standard and "requires the antitrust plaintiff

5   to demonstrate that a particular contract or combination is in fact unreasonable and

6   anticompetitive." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011).

7   This rule requires a court to examine a variety of factors such as information about the relevant

8   business, its condition before and after the restraint was imposed, and the restraint's history and

9   effect.  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  Next, a small category of restraints are

10  considered illegal per se because "they always or almost always tend to restrict competition and

11  decrease output."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018).  Because per se

12  agreements are so "manifestly anticompetitive" and lacking in "any redeeming virtue," the

13  detailed industry analysis required under the rule of reason is not required for per se restraints.

14  Finally, the "quick look" analysis applies to a certain class of restraints that is "not unambiguously

15  in the per se category" but "may require no more than cursory examination to establish that their

16  principle or only effect is anticompetitive."  *Safeway, Inc.*, 651 F.3d at 1133.

17       Here, PBTM does not specify whether it pleads its antitrust claims under the per se rule,

18  quick look, or rule of reason.  *See generally* Dkts. #26, #34.  The Court therefore applies the

19  presumptive, default rule of reason standard, which is consistent with the standard courts typically

20  apply to claims alleging trade restraints imposed by a sports league.  *See Am. Needle, Inc. v. New*

21  *Orleans Louisiana Saints*, 385 F. Supp. 2d 687, 691 (N.D. Ill. 2005) (collecting cases).  Under

22  the rule of reason, plaintiffs must plead a relevant market to state an antitrust claim under Sections

23  1 or 2 of the Sherman Act.  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).

24

1   Plaintiffs need not plead a relevant market with specificity, but "[t]here are . . . some legal

2   principles that govern the definition of an antitrust 'relevant market,' and a complaint may be

3   dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially

4   unsustainable." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

5        The relevant market must include "both a geographic market and a product market."

6   *Hicks*, 897 F.3d at 1120 (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096,

7   1104 (9th Cir. 1999). A product market "must encompass the product at issue as well as all

8   economic substitutes for the product." *Newcal Indus.*, 513 F.3d at 1045. Economic substitutes

9   have a "reasonable interchangeability of use" or sufficient "cross-elasticity of demand" with the

10  relevant product. *Id.* (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8

11  L.Ed.2d 510 (1962)); *see also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377,

12  395 (1956) ("In considering what is the relevant market for determining the control of price and

13  competition, no more definite rule can be declared than that commodities reasonably

14  interchangeable by consumers for the same purposes make up that 'part of the trade or commerce'

15  . . . .").

16       A plaintiff may also plead antitrust violations within a specific sub-market of the general

17  market. In a general product market, "well-defined submarkets may exist which, in themselves,

18  constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502.

19  To plead an antitrust claim based on a submarket, a plaintiff "must be able to show (but need not

20  necessarily establish in the complaint) that the alleged submarket is economically distinct from

21  the general product market." *Newcal Indus.*, 513 F.3d at 1045. "In *Brown Shoe*, the Supreme

22  Court listed several 'practical indicia' of an economically distinct submarket: 'industry or public

23  recognition of the submarket as a separate economic entity, the product's peculiar characteristics

24

1   and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price

2   changes, and specialized vendors.'"  *Id.* (quoting 370 U.S. at 325, 82 S.Ct. 1502).

3        PBTM claims that the relevant market restrained by Defendants' actions is "Products[2]

4   bearing the number 12 associated with the Seahawks by color or other indicia."  Dkt. #26 at ¶ 46.

5   Defendants move to dismiss on the basis that PBTM has failed to explain why Seahawks-affiliated

6   products bearing the number 12 constitute a distinct product market, including why "12" products

7   are not interchangeable with other numbers, other NFL-team branded products, other regional

8   sports team branded products including the Mariners, Sounders, Huskies or Cougars, or other

9   athletic apparel in general.  Dkt. #30 at 28.  PBTM responds that the Seahawks have defined the

10  "unique, relevant market" because of fans' relationship to the number 12, symbolizing the

11  Twelfth Man.  Dkt. #34 at 25.  Consequently, "similar products *without the 12 logo or Seahawks*

12  *indicia* are irrelevant, because they would not serve that same purpose."  *Id.* at 26 (emphasis

13  added).

14       PBTM provides two cases to support its argument that trademarked "12" products

15  constitute a relevant market.  *See* Dkt. #34 at 26 (citing *Dang v. Niners,* 964 F. Supp. 2d 1097,

16  1106 (E.D. Cal. 2013), and *American Needle, Inc.*, 385 F. Supp. 2d at 1105).  However, neither

17  of these cases addresses whether products for a single NFL team, let alone products based on a

18  single number for that team, may comprise a market for purposes of an antitrust action.  *American*

19  *Needle* held that products bearing the logos of multiple NFL teams may constitute a market.  *Id.*

20  However, in reaching its conclusion, the court noted that it was "not considering whether

21  headwear and apparel carrying *one NFL team's logo constitutes its own market*, we are

22

---

[2] PBTM defines "Products" as goods and services listed under International Classes 14, 16, 18, 24 and 25
23  for trademark registration, which include jewelry, paper goods and printed matter, leather and imitation
leather goods, travel bags and umbrellas, textiles and textile goods, bed and table covers, and clothing,
24  footwear and headwear.  *See* Dkt. #26 at ¶ 46, n.6.

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 27

1    considering whether, as a matter of law, *all headwear and apparel carrying NFL team logos*

2    cannot constitute a market unto itself." *Id.* (emphases added).

3            Similarly, *Dang* found that plaintiff sufficiently stated an antitrust claim where the alleged

4    market comprised "at least thirty different and competing professional football teams as well as

5    the intellectual property owned by the NFL itself." *Dang*, 964 F. Supp. 2d at 1106 (Holding that

6    apparel decorated with NFL logos could be separate sub-market from all other logo-bearing

7    apparel, including those of other sports leagues.)  Unlike in *Dang* and *American Needle*, the

8    relevant market proposed here consists entirely of different versions of a single number associated

9    with one team.  *See* Dkt. #34 at 26 ("Only PBTM has competed, and can compete, in the market

10   for Seahawks 12-related products because they own six 12-related trademarks that appeared on

11   the same type of products that the FNW, NFLP and licensed vendors sell.").  Consequently,

12   neither of these cases supports the proposition PBTM advances here—that a single number used

13   alongside one sports team's logo can be a sub-market unto itself.

14           PBTM also argues that the Supreme Court "has recognized that sports provide unique

15   markets for antitrust purposes that make non-sports related definitions of market irrelevant." Dkt.

16   #34 at 26, n.22 (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,

17   468 U.S. 85 (1984); *Int'l Boxing Club of N.Y. Inc. v. United States*, 358 U.S. 242, 252 (1959).

18   Again, neither of these cases addresses markets for products bearing a single team's logo, let

19   alone markets comprised solely of variations of a single number used alongside that team's logo.

20   *Bd. Of Regents* recognized that the college football market was unique enough that advertisers

21   did not have reasonable alternatives.  *See Bd. of Regents*, 468 U.S. 85.  *Int'l Boxing* Club, in turn,

22   found that championship boxing comprised a relevant market.  *Int'l Boxing Club*, 358 U.S. at

23   252.  While these cases indicate that sports-related intellectual property can form a market, they

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 28

1    do not support the far narrower market definition that PBTM asks the Court to accept here: a

2    sub-market defined by a single number associated with a single team.

3         PBTM also tries to analogize products bearing the number "12" to "cluster" markets in

4    banking.  *See* Dkt. #34 at 26, n.21 (citing *United States v. Phillipsburg Nat'l Bank & Trust Co.*,

5    399 U.S. 350, 360–61 (1970); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 356–57

6    (1963).  PBTM relies on these cases, which recognized commercial banking as a distinct line of

7    commerce, to show that a cluster of products "can constitute a relevant market if the cluster is

8    itself an object of consumer demand."  Dkt. #34 at 26.  However, these cases do not invalidate or

9    alter the "definite rule" of antitrust law that a relevant market must include commodities

10   reasonably interchangeable by consumers.  *E. I. du Pont de Nemours & Co.*, 351 U.S. at 395.

11        Having considered the reasonable interchangeability of 12-based Seahawks products, the

12   Court cannot conclude that PBTM has alleged sufficient facts to plausibly plead a relevant market.

13   PBTM insists that its proposed definition is a "narrow sub-market," Dkt. #34 at 26, n.23, yet it

14   offers none of the defining features of a distinct submarket such as "industry or public recognition

15   . . . peculiar characteristics and uses, unique production facilities, distinct customers, distinct

16   prices, sensitivity to price changes, and specialized vendors."  *Little Brown Shoe*, 370 U.S. at 325,

17   82 S.Ct. 1502.  Instead, PBTM's argument hinges solely on the significance of the number 12 to

18   Seahawks fans, given that other numbers or logos "would not serve that same purpose" of

19   conveying fans' "unique relationship as part of the Seahawks 'team.'"  Dkt. #34 at 26.

20        PBTM's claim that the number "12" holds particular historical significance is insufficient

21   to plead a sub-market for purposes of an antitrust action.  Taking PBTM's claims to be true that

22   the number "12" holds special meaning to fans, courts regularly reject such *sui generis* arguments

23   that the unique attributes of a product automatically signify that the product independently

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 29

comprises a market or sub-market. *See Delano Farms Co. v. California Table Grape Com'n*, 655 F.3d 1337, 99 U.S.P.Q.2d 1827, 2011-2 Trade Cas. (CCH) ¶ 77578 (Fed. Cir. 2011) (Attributes of single variety of grape insufficient to allege distinct submarket for that grape, "particularly when it is undisputed that other vines possess *at least some of the relevant characteristics*.") (emphasis added); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 265 (S.D.N.Y. 2000) ("Courts in this district have rejected the proposition that allegedly unique products, by virtue of customer preference for that product, are markets unto themselves.") (internal quotations omitted); *Wagner v. Circle W. Mastiffs*, 732 F. Supp. 2d 792 (S.D. Ohio 2010) (Explanation of American Mastiff's unique appearance and temperament and customer preference for that breed "does not suggest why other breeds of companion dogs could not be reasonably interchangeable alternatives.").

Here, PBTM offers only the conclusory assertion that being part of the Seahawks "12s" cannot be accomplished without buying a 12-related product. Dkt. #34 at 27. Nothing in the Complaint explains why products with the Seahawks logo, associated with other meaningful numbers or symbols for Seahawks fans such as number 3 for Russell Wilson or number 68 for Damien Lewis, are not reasonably interchangeable with products associated with the number 12. In effect, PBTM's proposed sub-market asks the Court to conclude that the market for 12-numbered Seahawks products is so wholly segmented and unique from available substitutes that a rise in the price of number 12 products would not shift demand to products bearing alternative numbers or graphics. PBTM has presented no plausible basis for the Court to reach such a conclusion.

Accordingly, the Court finds that PBTM has failed to adequately plead a relevant product market. Because Sections 1 and 2 of the Sherman Act both require plaintiffs to plead a relevant

1   market, *Hicks*, 897 F.3d at 1120, PBTM's antitrust claims under Counts 5-8 are dismissed for

2   failure to state a claim.

3   **E. Tying Claim**

4       PBTM also claims that by conditioning the purchase of the LEGION OF BOOM mark on

5   the inclusion of paragraph 22 in the LEGION OF BOOM Agreement, the Seahawks engaged in

6   unlawful tying in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count 9).  *Id.* at ¶¶

7   108-113.  Defendants move to dismiss PBTM's tying claim as time-barred and for failure to state

8   a claim.

9       As with Counts 5-8, the four-year limitations period for federal and state antitrust claims

10  applies to PBTM's tying claim.  However, for a claim alleging an unlawful tying arrangement,

11  the cause of action first accrues when the arrangement was executed or became effective.  *Joseph*

12  *v. Amazon.com, Inc.*, 46 F. Supp. 3d 1095, 1101 (W.D. Wash. 2014); *see also Rite Aid Corp. v.*

13  *Am. Exp. Travel Related Servs. Co., Inc.,* 708 F.Supp.2d 257, 265 (E.D.N.Y.2010). "To restart

14  the statute of limitations in a tying situation, [a plaintiff] must show that [a defendant] had the

15  ability [to] and actually did enforce the tie during the limitations period." *Eichman v. Fotomat,*

16  880 F.2d 149, 160 (9th Cir. 1989) (citation omitted).  In contrast to PBTM's other antitrust claims,

17  the Court does not find that the continuing violations doctrine applies here.

18      PBTM alleges that Defendants unlawfully tied purchase of the LEGION OF BOOM

19  trademark to the inclusion of paragraph 22, in which the tied product is the V12 family of

20  trademarks and the tying arrangement is PBTM's execution of the contract. Dkt. #26 at ¶ 109.

21  Unlike PBTM's other antitrust claims, where new and accumulating injury is inflicted by

22  Defendants' refusal of consent or oppositions at the TTAB, the tying claim challenges the act of

23  forcing PBTM to accept a condition in a contract that it did not want and/or agree to accept in

24

order to sell the LEGION OF BOOM mark.  The alleged tying arrangement was therefore complete in 2014 when parties executed the agreement—no continuing violation was inflicted through repeated coercion of PBTM to trade its rights to the V12 family for sale of the LEGION OF BOOM mark.  Given that the alleged tying arrangement was completed in 2014 with execution of the LEGION OF BOOM Agreement, PBTM's tying claim is time-barred.

Even if PBTM's tying claim were timely, it has also failed to properly plead or otherwise support a claim for unlawful tying.  "A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Rick–Mik Enter, Inc. v. Equilon Enter. LLC,* 532 F.3d 963, 971 (9th Cir. 2008) (quoting *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 912 (9th Cir. 2008)).  "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)."  *Id.* (citations omitted).  "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product."  *Id.*

Here, PBTM alleges injury based on Defendants inserting paragraph 22 into the LEGION OF BOOM Agreement without adding the "non-mandatory" language as requested.  "Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation."  *Joseph*, 46 F. Supp. 3d at 1103 (internal citation omitted).  Nothing in the complaint alleges that Defendants refused to purchase the LEGION OF BOOM mark unless PBTM agreed to paragraph 22 as Defendants drafted it.  Although PBTM claims that Seahawks' management pressured it to sign the agreement immediately, it concedes that PBTM unknowingly accepted the condition due to "cursory review" of the agreement.  Dkt. #26 at ¶ 30.  This

1  deficiency is fatal to PBTM's tying claim, given that "mere sales pressure" does not constitute

2  coercion. *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1160 (9th Cir. 2003).

3  **F. Claims for Declaratory Judgment and Injunctive Relief (Counts 1-2)**

4      Finally, the Court will analyze PBTM's claims for declaratory judgment and injunctive

5  relief. In Count 1, PBTM seeks a declaration from this Court pursuant to 28 U.S.C. § 2201 and

6  15 U.S.C. § 1119 that PBTM has the right to register the mark at issue, No, 88477341, as well as

7  an order pursuant to 15 U.S.C. § 1116 that directs the USPTO to grant PBTM a U.S. trademark

8  for the mark. Dkt. #26 at ¶¶ 65-69. Similarly, Count 2 seeks an order declaring that five of the

9  Seahawks' trademarks should be cancelled, and an order directing the USPTO to cancel those

10  trademarks. Dkt. #26 at ¶¶ 70-73.

11      As currently pleaded, PBTM's claims for declaratory and injunctive relief appear to

12  depend on the viability of its time-barred contract reformation claims—namely, that the LEGION

13  OF BOOM Agreement is invalid and should be reformed such that PBTM may freely use its V12

14  marks without opposition or threat of litigation from Defendants. Regarding PBTM's right to

15  register and use its own marks and fear of litigation from Defendants under Count 1, PBTM

16  claims that "Defendants have used the contested LEGION OF BOOM Agreement as a cudgel,

17  threatening both contract and infringement litigation if PBTM dares to use their lawful trademarks

18  to compete with them in the sale of Seahawks related paraphernalia bearing the number 12." Dkt.

19  #26 at ¶ 46; *see also id.* at ¶ 35 (Claiming "a real and reasonable apprehension that PBTM will

20  face litigation from the Defendants, either for breach of contract or infringement."). Similarly,

21  its claims under Count 2 requesting cancellation of the Seahawks' marks likewise appear to

22  depend on PBTM's theory that the LEGION OF BOOM Agreement is unlawful. *Id.* at ¶ 59

23  ("PBTM's trademarks are senior in use to Seahawks for the number 12 . . . [they] could be, and

24

1   would be, sold in interstate commerce *but for the Seahawks' use of Paragraph 22 of the LEGION*

2   *OF BOOM Agreement* to prevent PBTM from doing so.") (emphasis added).

3          While parties extensively brief whether this Court may exercise subject matter jurisdiction

4   over these claims in the first instance, the Court need not reach the issue.  Even if such jurisdiction

5   exists, it appears doubtful that PBTM's trademark-related claims can proceed independently from

6   its time-barred reformation claims.  Because the Third Amended Complaint predicates PBTM's

7   claims for infringement and unlawful litigation threats on reformation of the 2014 LEGION OF

8   BOOM Agreement, *see* Dkt. #26 at ¶¶ 35, 47, 59, the Court finds that PBTM has failed to state a

9   plausible claim for relief for Counts 1 and 2.

10  **G.  Leave to Amend**

11         After briefing closed on Defendants' motion to dismiss, PBTM moved for leave to amend

12  its complaint to include new oppositions filed by Defendants before the TTAB.  Dkt. #40.

13  Defendants oppose on the basis that amendment is futile.  Dkt. #42, #43.  The proposed amended

14  complaint contains no new causes of action but merely adds factual allegations related to the new

15  oppositions.  *See* Dkt. #40 at 6-41.  Because PBTM's proposed amended complaint was filed

16  prior to this Court's resolution of Defendants' motions to dismiss, it does not remedy the

17  deficiencies identified in the instant order.  For that reason, PBTM's Motion for Leave to Amend,

18  Dkt. #40, is DENIED as moot.

19         Notwithstanding PBTM's premature attempt to amend, the Court must consider whether

20  leave to amend is warranted following dismissal.  Where a complaint is dismissed for failure to

21  state a claim, "leave to amend should be granted unless the court determines that the allegation

22  of other facts consistent with the challenged pleading could not possibly cure the deficiency."

23  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).  Here,

24

1  the Court has dismissed Counts 1-2, Counts 5-8, and PBTM's breach of contract claim under

2  Count 3c for failure to state a claim.  Given that this is the first Rule 12(b)(6) dismissal of PBTM's

3  claims, the Court cannot conclude at this stage that leave to amend these claims would be futile.

4  Accordingly, these claims are dismissed without prejudice and with leave to amend.

5        However, the Court finds that amendment of PBTM's time-barred claims under Count 3

6  and all claims under Counts 4 and 9 would be futile.  Because PBTM's reformation claims under

7  Count 3a and claims arising before December 23, 2016 under Count 3b are time-barred,

8  amendment would be futile.  PBTM's claims under Count 4 fail as a matter of law as they rely on

9  the meritless theory that the terms and enforcement of the LEGION OF BOOM Agreement may

10  breach the terms of the 2011 contract.  Finally, Count 9 is both time-barred and fails to state a

11  plausible claim for relief.  These deficiencies cannot be cured through further amendment.

12  Accordingly, these claims are dismissed with prejudice.

13                          **IV.    CONCLUSION**

14        Having reviewed Defendants' Motions, Plaintiffs' Response, Defendants' Replies, and

15  the remainder of the record, it is hereby ORDERED that the Seahawks' Request for Judicial

16  Notice, Dkt. #32, is GRANTED and Defendants' Motions to Dismiss, Dkts. #28, #30, are

17  GRANTED as follows:

18        (1) PBTM's claims for declaratory and injunctive relief (Counts 1-2) and antitrust claims

19  (Counts 5-8) and claims for breach of the LEGION OF BOOM Agreement (Count 3c) are

20  DISMISSED without prejudice and with leave to amend;

21        (2) PBTM's claims for breach of duty of good faith and fair dealing (Count 3b) are

22  DISMISSED IN PART.  The Court GRANTS dismissal of PBTM's fair dealing claims arising

23

24

1    before December 23, 2016 with prejudice and without leave to amend, and DENIES dismissal of

2    the remaining claims.

3         (3) PBTM's claims for reformation of the LEGION OF BOOM Agreement (Count 3a),

4    claims related to the 2011 Agreement (Count 4), and claim for unlawful tying (Count 9) are

5    dismissed with prejudice and without leave to amend.

6         (4) PBTM's Motion for Leave to Amend, Dkt. #40, is DENIED as moot.

7         (5) PBTM is ORDERED to file a Fourth Amended Complaint within thirty (30) days from

8    the date of this Order.

9

10         DATED this 5th day of January, 2021.

11

12

13    RICARDO S. MARTINEZ
      CHIEF UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

ORDER RE: DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR
LEAVE TO AMEND - 36