1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   PBTM LLC,                                    CASE NO. C19-2081-RSL

11                        Plaintiff,

12              v.                                ORDER GRANTING IN PART
                                                  DEFENDANTS' MOTIONS TO DISMISS
13   FOOTBALL NORTHWEST, LLC, *et al.*,

14                        Defendants.

15

16      This matter comes before the Court on "Defendant NFL Properties LLC's Motion to

17   Dismiss Plaintiff's Fourth Amended Complaint and Joinder in Football Northwest LLC's Motion

18   to Dismiss" (Dkt. #48) and "Defendant Football Northwest LLC's Motion to Dismiss the Fourth

19   Amended Complaint for Lack of Subject Matter Jurisdiction and for Failure to State a Claim"

20   (Dkt. #49). Having reviewed the submissions of the parties,[1] the Court finds as follows:

21      //

22

23   _____

     [1] This matter can be decided on the memoranda submitted. Defendants' requests for oral
24   argument are DENIED.

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 1

1                                I.       BACKGROUND

2       **A.  Factual Background**

3              PBTM, previously known as Volume 12, LLC, is a Nevada limited liability company.

4    PBTM brings this action against defendants Football Northwest LLC ("the Seahawks") and

5    NFL Properties, LLC ("NFLP") related to the licensing and registration of trademarks

6    involving the number "12."

7              Since 2009, PBTM has developed and used marks incorporating the number 12 with the

8    word "VOLUME" or "V" in reference to Seahawks fans. Dkt. #47 at ¶¶ 26-27. The number

9    "12" refers to the Twelfth Man, a term used in American football to honor fans as the twelfth

10   member of the team, while "volume" references Seahawks fans' record-breaking crowd roar.

11   *Id.* at ¶ 31. In June 2009, PBTM began using a styled number 12 in conjunction with the term

12   "Volume" or "V" on products that included towels, flags, banners and flyers:

13
14
15                         
16

17   *Id.* at ¶ 36. On January 31, 2017, PBTM registered this mark with the United States Patent and

18   Trademark Office ("USPTO") under registered trademark No. 5,132,208. *Id.*

19              In the first quarter of 2011, Seahawks management informed PBTM that they wanted

20   the VOLUME 12 trademark to be associated exclusively with the Seahawks and did not want

21   other Seattle sports teams using the mark. *Id.* at ¶ 29. On June 7, 2011, the Seahawks and

22   PBTM entered into a license agreement ("the 2011 Agreement") that granted the Seahawks

23   exclusive rights to use VOLUME 12 on stationary, signage, video boards, and LED displays

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 2

1    within the stadium and to promote and publicize VOLUME 12 "anywhere in the public

2    domain" but only in conjunction with the sale of Seahawks jerseys. Dkt. #25-1. In return,

3    PBTM received the "opportunity to capitalize on the publicity" created by the Seahawks' use of

4    the mark. Dkt. #47 at ¶ 29.

5         From 2009 through 2011, PBTM's original VOLUME 12 design was used on the

6    banners and flags in the stadium. *Id.* at ¶ 30. In 2012, however, the Seahawks' graphics

7    department developed new designs for the VOLUME 12 banners. PBTM and the Seahawks

8    "jointly selected a design" used on the team's end zone banners for the 2012 season. In June

9    2013, PBTM opened a VOLUME 12 commercial store in Redmond Town Center to sell

10   Seahawks-related products. *Id.* at ¶ 31. The Seahawks did not protest PBTM's use of

11   VOLUME 12 or claim infringement related to the VOLUME 12 marks.

12        After the Seahawks won the Superbowl in 2014, PBTM and the Seahawks entered into

13   negotiations for purchase of the VOLUME 12 trademark. *Id.* at ¶ 43. PBTM sought "at least

14   $400,000" to recoup their costs in developing the VOLUME 12 trademark, and the Seahawks

15   ultimately declined to buy the mark. The parties thereafter discussed a separate PBTM

16   trademark that used a stylized design of the phrase, "LEGION OF BOOM."  The Seahawks'

17   general counsel drafted a purchase agreement for the trademark ("the LEGION OF BOOM

18   Agreement"), which the parties signed on August 24, 2014. Dkt. #25-2.

19        PBTM alleges that parties did not discuss the VOLUME 12 mark during the LEGION

20   OF BOOM negotiations and was therefore "surprised to see later drafts" of the LEGION OF

21   BOOM Agreement that included clauses about the VOLUME 12 mark. Dkt. #47 at ¶ 43.

22   PBTM alleges that it specifically objected to paragraphs 21 and 22 and "wanted them deleted,"

23   since they contained language requiring that PBTM obtain the Seahawks' consent prior to

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 3

marketing a LEGION OF BOOM or VOLUME 12 product. *Id.* at ¶ 44. Seahawks management

allegedly insisted that paragraphs 21 and 22 remain but promised to add language to those

paragraphs making their consent "not mandatory." *Id.* The Seahawks prepared and distributed

the execution version of the LEGION OF BOOM Agreement in which they made the requested

change to only paragraph 21, not to paragraph 22. "PBTM gave the execution version a cursory

review" but "did not notice the discrepancy" between the document and its expectations before

signing. *Id.* Consequently, the version of paragraph 22 in the executed LEGION OF BOOM

Agreement reads as follows:

> Given [the Seahawks'] rights and interest in the trademark "12," VOLUME 12 LLC
> will not offer or market goods or services under "VOLUME 12" or any other mark
> containing "12" or "TWELVE" to or in connection with any team or any sport other
> than Seattle Seahawks football. *Further, VOLUME 12 LLC shall seek and obtain
> prior written approval of [the Seahawks] before producing, advertising and/or
> selling or otherwise distributing any product featuring a trademark that
> incorporates "12."* It is understood that [the Seahawks are] under no commitment
> to purchase, market or distribute "VOLUME 12" goods or services.

Dkt. #25-2 at 6 (emphasis added). Shortly after signing, PBTM discovered that the "not

mandatory" language was omitted from paragraph 22. Despite reassurances from the

Seahawks' general counsel that they would add the language, they never did. Dkt. #47 at ¶ 44.

Following execution of the LEGION OF BOOM Agreement, the Seahawks took the

position that PBTM could use their "12" trademarks on products only if there was no

association with the Seahawks. *Id.* at ¶ 45. This, PBTM alleges, was a critical blow to their

business: "the Seahawks knew that the economic value of the PBTM trademarks to PBTM

depended upon an association and connection to the Seahawks and that PBTM's business

would be shattered without this association." *Id.* In May 2016, the Seahawks proposed a

"settlement agreement" that would allegedly "allow PBTM to use their lawful trademarks

under onerous conditions that removed any association with the Seahawks and forbade any

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 4

1    challenges to the Seahawks' "12" trademark efforts." *Id.* at ¶ 47. PBTM refused. In 2017,

2    PBTM requested consent for a "Turn the Volume UP to 12" mark, which the Seahawks again

3    refused. *Id.* at ¶ 48. PBTM claims that since 2016, the Seahawks have refused consent on any

4    proposed use of a "V12" or VOLUME 12 mark containing any association with the Seahawks.

5    In a letter dated November 29, 2017, from the Seahawks' outside counsel, the Seahawks

6    informed PBTM that PBTM would not be permitted to use its trademarks unless PBTM agreed

7    to the settlement agreement. *Id.* at ¶ 49. The parties unsuccessfully met in 2018 and 2019 to try

8    to reach a different agreement as to PBTM's use of its trademark. *Id.* Starting in November

9    2019, the Seahawks began filing oppositions at the USPTO to prevent PBTM from registering

10   any additional 12-related trademarks. *Id.* at ¶¶ 18-20. Six such oppositions have been filed to

11   date.

12   **B. Procedural Background**

13       PBTM filed this lawsuit on December 23, 2019. Dkt. #1. On January 5, 2021, the

14   Honorable Ricardo S. Martinez, United States District Judge, granted in part defendants'

15   motions to dismiss. Dkt. #46. PBTM filed its Fourth Amended Complaint on February 4, 2021,

16   seeking a declaration that PBTM has the right to register six 12-related marks and that five

17   trademarks owned by the Seahawks must be cancelled. Dkt. #47 at ¶¶ 65-75. PBTM also

18   alleges breach of the covenant of good faith and fair dealing in the LEGION OF BOOM

19   Agreement, *id.* at ¶¶ 76-79, antitrust violations under the Sherman Act and Washington state

20   law, *id.* at ¶¶ 80-99, and trademark infringement under the Lanham Act, *id.* at ¶¶ 100-108.

21   Finally, PBTM seeks recission of the 2011 Agreement. *Id.* at ¶¶ 109-111. Defendants move to

22   dismiss these claims under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and

23   under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 5

1     **II.     DISCUSSION**

2     **A.  Standards of Review**

3          Federal Rule of Civil Procedure 12(b)(1) authorizes a motion for dismissal based on a

4     lack of subject matter jurisdiction. When a court lacks subject matter jurisdiction, it lacks the

5     power to proceed, and its only remaining function is to dismiss. *Steel Co. v. Citizens for a Better*

6     *Env't*, 523 U.S. 83, 94 (1998). Once the moving party has asserted lack of subject matter

7     jurisdiction, the court will presume that there is no jurisdiction, and the burden is on the party

8     asserting jurisdiction to prove otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

9     375, 377 (1994). "A jurisdictional challenge under Rule 12(b)(1) may be made either on the

10    face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide,*

11    *Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

12    2000)).

13         In making a 12(b)(6) assessment, the court accepts all facts alleged in the complaint as

14    true and draws all inferences in the light most favorable to the non-moving party. *Baker v.*

15    *Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (citations omitted).

16    However, the court is not required to accept as true a "legal conclusion couched as a factual

17    allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

18    550 U.S. 544, 555 (2007)). The complaint "must contain sufficient factual matter, accepted as

19    true, to state a claim to relief that is plausible on its face." *Id.* at 678. This requirement is met

20    when the plaintiff "pleads factual content that allows the court to draw the reasonable inference

21    that the defendant is liable for the misconduct alleged." *Id.* The complaint need not include

22    detailed allegations, but it must have "more than labels and conclusions, and a formulaic

23

24

1    recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Absent

2    facial plausibility, a plaintiff's claims must be dismissed. *Id.* at 570.

3    **B.   Duty of Good Faith and Fair Dealing (Count 3)**

4           PBTM claims that the Seahawks breached the implied duty of good faith and fair

5    dealing in the LEGION OF BOOM Agreement by refusing to approve PBTM's use of  marks

6    containing "12" or "TWELVE" in a bad faith effort to damage PBTM's business and acquire

7    PBTM's trademarks without fair compensation. Dkt. #47 at ¶ 78.[2] Under Washington law,

8    "[t]here is in every contract an implied duty of good faith and fair dealing " that "obligates the

9    parties to cooperate with each other so that each may obtain the full benefit of performance."

10   *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569 (1991). The implied duty of good faith and fair

11   dealing arises only in connection with the obligations imposed on the parties by the contract,

12   however. *See Smugglers Cove, LLC v. Aspen Power Catamarans*, *LLC*, No. C19-0277MJP,

13   2020 WL 758107, at *4 (W.D. Wash. Feb. 14, 2020) ("[T]here is no 'free-floating duty of good

14   faith unattached to the underlying legal document.'") (quoting *Badgett*, 116 Wn.2d at 570);

15   *Johnson v. Yousoofian*, 84 Wn. App. 755, 762 (1996) ("The implied duty of good faith is

16   derivative, in that it applies to the performance of specific contract obligations. If there is no

17   contractual duty, there is nothing that must be performed in good faith.") (citations omitted).

18   Defendants move to dismiss this claim on the ground that PBTM has failed to allege a

19   contractual duty to which the implied covenant of good faith and fair dealing can attach.

20

21

---

22          [2] PBTM also alleges that the Seahawks breached the implied duty of good faith and fair
     dealing by proposing an unreasonable settlement agreement as a condition of allowing PBTM to
23   use its trademarks and by filing oppositions at the USPTO's Trademark Trial and Appeal Board
     ("TTAB"). Dkt. #47 at ¶ 78. There are no contractual provisions regarding these activities,
24   however, and PBTM has apparently abandoned these aspects of the implied duty claim.

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 7

PBTM argues that the first sentence of paragraph 22 means that "they *could continue to use their marks* on Seahawks-associated products because the Seahawks wanted them to," despite the fact that the second sentence "gives the Seahawks complete discretion to with-hold consent." Dkt. #47 at ¶ 45 (emphasis in original). The first two sentences of paragraph 22 read:

> Given [the Seahawks'] rights and interest in the trademark "12,"[] VOLUME 12 LLC will not offer or market goods or services under "VOLUME 12" or any other mark containing "12" or "TWELVE" to or in connection with any team or any sport other than Seattle Seahawks football. Further, VOLUME 12 LLC shall seek and obtain prior written approval of [the Seahawks] before producing, advertising and or selling or otherwise distributing any product featuring a trademark that incorporates "12."

Dkt. # 25-2 at 6. As set forth in the Judge Martinez' previous order, the 2014 LEGION OF BOOM Agreement imposes no duty on the Seahawks to grant permission to PBTM to use the V12 or VOLUME 12 marks. *See* Dkt. #46 at 14-15 (concluding that the Agreement "expressly imposes a duty on PBTM to limit use of V12 marks to associations with the Seahawks" but "contains no mention of any corresponding duty on the Seahawks to grant permission to use the marks."). Paragraph 22 imposes no express or implied duty on the Seahawks to consent to PBTM's use of the "12" trademark. Consequently, PBTM cannot plausibly state a claim for breach of the duty of good faith and fair dealing based on the Seahawks' contractually permissible decision to refuse to authorize the use of the marks. *Hard 2 Find Accessories, Inc. v. Amazon.com, Inc.*, 58 F. Supp. 3d 1166, 1174 (W.D. Wash. 2014) ("Because the Court has determined that no such contractual duties existed, there is also no duty to perform such obligations in good faith."); *Condon v. Condon*, 177 Wn.2d 150, 163 (2013) (courts will not use concepts of implied duty to "impose obligations that the parties did not assume for themselves"); *Badgett*, 116 Wn.2d at 570 ("[T]here cannot be a breach of the duty of good faith

1   when a party simply stands on its rights to require performance of a contract according to its

2   terms.").

3        PBTM relies on *Rekhter v. State, Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 113

4   (2014), for the proposition that a party may violate the duty of good faith and fair dealing where

5   it has exercised retained discretion in a way that "defeat[s] PBTM's expectations and put[s]

6   PBTM in an untenable position." Dkt. # 51 at 15. *Rekhter* is inapposite. That case involved a

7   contract provision which gave one party  "discretion to select the formula or method used to

8   calculate a particular value in the contract." 180 Wn.2d at 114. The value, which represented the

9   number of hours and the types of services for which care providers would be paid, was an

10  essential part of the contract. The agency was contractually obligated to determine the missing

11  value, and good faith limited the way in which it carried out that duty. When it chose to require

12  live-in care workers to perform certain services but declined to pay them for the work, the jury

13  found that the agency had breached its duty of good faith and fair dealings. 180 Wn.2d at 115-

14  16.

15        In this case, on the other hand, the relevant contract provision did not have as its object

16  the calculation or choice of an additional, unstated contract term. Nor did it require the

17  Seahawks to do anything. Rather, the Seahawks negotiated, and PBTM agreed, that (a) PBTM

18  would not use its mark in connection with any other sport and (b) it would obtain the Seahawks'

19  written approval before using the mark in connection with football. PBTM wants to use the duty

20  of good faith and fair dealing to superimpose its subjective expectations on paragraph 22 and

21  limit the Seahawks' discretion when determining whether to approve PBTM's use of the mark.

22  But the duty of good faith and fair dealing "does not extend to obligate a party to accept a

23  material change in the terms of the contract." *Badgett*, 116 Wn.2d at 569. PBTM has no

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 9

1   contractual right to use the "12" mark, and the Seahawks have no contractual obligation to grant

2   permission for its use. The Seahawks' refusal to authorize PBTM to use the "12" mark cannot,

3   therefore, frustrate PBTM's right to benefits under the contract (*Aventa Learning, Inc. v. K12,*

4   *Inc.*, 830 F. Supp.2d 1083, 1101 (W.D. Wash. 2011)) or its justified expectations (*Frank*

5   *Coluccio Const. Co., Inc.* . *King County*, 136 Wn. App. 751, 766 (2007) (quoting Restatement

6   (Second) of Contracts § 205 cmt. A (1979)). Nor did the Seahawks' exercise of the discretion

7   granted by the contract involve the determination of a contract term (Rekhter, 180 Wn.2d at

8   113) or an impermissible redefining or interpretation of the contract terms (*Scribner v.*

9   *Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001)). While PBTM now seeks to soften the

10   language of this mandatory consent provision, it cannot remedy its mistake through an implied

11   duty untethered to the plain language of the agreement. PBTM's claim for breach of duty of

12   good faith and fair dealing fails as a matter of law.

13   **C. Antitrust (Counts 4-7)**

14        In Counts 4 through 7, PBTM alleges that defendants' anti-competitive conduct violates

15   antitrust laws under Sections 1 and 2 of the Sherman Act and parallel state laws. Dkt. #47 at

16   ¶¶ 80-89. Specifically, PBTM claims that defendants intentionally conspired to take, have taken,

17   and continue to take concerted action to unlawfully and unreasonably restrain trade in violation

18   of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count 6), and Washington state law, RCW

19   19.86.030 (Count 7) and that defendants' actions create an unlawful monopoly or attempted

20   monopoly that unreasonably restrains trade in violation of Section 2 of the Sherman Act, 5

21   U.S.C. § 2 (Count 4), RCW § 19.86.040, and Wash. Const. Art. 12 § 22 (Count 5). Defendants

22   move to dismiss PBTM's antitrust claims under Rule 12(b)(6).

23

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 10

To survive a motion to dismiss, an antitrust complaint "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Newman v. Universal Pictures,* 813 F.2d 1519, 1522 (9th Cir. 1987). The Court's analysis of PBTM's federal antitrust claims extends to its state law claims, which are patterned after Sections 1 and 2 of the Sherman Antitrust Act. *State v. Black*, 100 Wn.2d 793, 799 (1984); *see also* RCW 19.86.920 ("[I]n construing [the WCPA], the courts [shall] be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters . . . .").

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 1. To state a claim under Section 1, a plaintiff must allege (1) a contract, combination, or conspiracy between two or more entities; (2) in unreasonable restraint of trade; that (3) affects interstate commerce. *See id.*; *Am. Ad. Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996). A Section 1 plaintiff must sufficiently plead a restraint of trade that is unreasonable under one of three analytical frameworks described as rule-of-reason, per se, or "quick look:"

> "[M]ost antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors...." *State Oil* [*Co. v. Khan*, 522 U.S. 1, 10 (1997)]. The rule of reason is the presumptive or default standard, and it requires the antitrust plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." [*Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)].

> "Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *State Oil*, 522 U.S. at 10. Such restraints " 'are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their

use.' " *Nw. Wholesale Stationers* [*v. Pac. Stationery & Printing Co*., 472 U.S. 284, 289 (1985)] (quoting *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958)). Per se treatment is proper only "[o]nce experience with a particular kind of restraint enables the [c]ourt to predict with confidence that the rule of reason will condemn it." *Ariz. v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982). "[A] 'departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing.' " *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) (second alteration in original) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-59 (1977)). To justify per se condemnation, a challenged practice must have "manifestly anticompetitive" effects and lack "any redeeming virtue." *Id.* at 886 (internal quotation marks omitted). The Supreme Court has " 'expressed reluctance to adopt *per se* rules where the economic impact of certain practices is not immediately obvious.' " *Dagher*, 547 U.S. at 5 (quotation marks and ellipses omitted) (quoting *State Oil*, 522 U.S. at 10).

"[A] certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive." [XI Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1911a, at 295-96 (2d ed. 2005)]. Stated another way, the rule of reason analysis can sometimes be applied " 'in the twinkling of an eye.' " [*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n. 39 (1984)] (quoting Phillip Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* 37–38 (Federal Judicial Center, June 1981)). The Supreme Court explained in *California Dental Ass'n v. FTC* that this truncated rule of reason or "quick look" antitrust analysis may be appropriately used where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." 526 U.S. 756, 770 (1999). "The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one." *Id.* at 781. Full rule of reason treatment is unnecessary where the anticompetitive effects are clear even in the absence of a detailed market analysis. *See NCAA*, 468 U.S. at 110. But if an arrangement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," then a "quick look" form of analysis is inappropriate. *Cal. Dental Ass'n*, 526 U.S. at 771.

*Cal. ex rel. Harris v. Safeway, Inc*., 651 F.3d 1118, 1133-34 (9th Cir. 2011) (footnotes omitted).

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 12

While courts typically need not decide which standard to apply at the pleading stage, they must still determine whether the complaint has alleged sufficient facts to state a claim under at least one of these three rules. *See In re High-Tech Employee Antitrust Litig.*, 856 F. Supp.2d 1103, 1122 (N.D. Cal. 2012). Here, PBTM alleges that "[t]he 'mandatory consent' provision in [paragraph] 22 of the LEGION OF BOOM Agreement that gives unilateral control to a competitor to prohibit the entry of a competitor in the Market is a provision that has an illegal, anticompetitive effect easily apparent under a 'quick look' antitrust analysis." Dkt. #47 at ¶ 55.

When evaluating the sufficiency of the Third Amended Complaint, Judge Martinez noted that PBTM had not specified which analytical framework applied and therefore used the presumptive rule-of-reason standard. Dkt. #46 at 25. Under that analysis, PBTM's antitrust claims were dismissed for failure to plausibly plead a relevant market and/or sub-market for a single NFL team's apparel using variations of a single number. Dkt. #46 at 28-31. Judge Martinez rejected PBTM's assertions that being part of the Seahawks' Twelfth Man required buying 12-related products and that the demand for those products was wholly segmented from the demand for other Seahawks logos, numbers, and symbols. The Court found that PBTM had failed to plausibly allege a market that contained all economic substitutes for PBTM's products, noting that non-12 Seahawks flags, banners, and apparels could serve as reasonably interchangeable indicia of team loyalty/support such that a rise in the price of 12-related products would likely shift demand to other Seahawks products. Dkt. #46 at 30. In an attempt to

1  remedy this deficiency, the Fourth Amended Complaint identifies the relevant market as

2  merchandise carrying NFL team trademarks in the Pacific Northwest. Dkt. # 47 at ¶ 53.[3]

3          The selection of a "quick look" analysis and the change in the relevant market allegation

4  do not save PBTM's Section 1 claim. Regardless whether the rule-of-reason or "quick look"

5  approach applies, the "ultimate question" is "what impact the challenged restraint has on

6  competition in the relevant markets." *In re NCAA Student-Athlete Name & Likeness Licensing*

7  *Litig.*, 37 F. Supp. 3d 1126, 1137 (N.D. Cal. 2014); *see McGlinchy v. Shell Chem. Co.*, 845 F.2d

8  802, 812-13 (9th Cir. 1988) ("It is the impact upon competitive conditions in a definable market

9  which distinguishes the antitrust violation from the ordinary business tort."). Now that PBTM

10 has redefined the relevant market to include all NFL trademarked products sold in the Pacific

11 Northwest, it must plausibly allege that a "quick look" at the arrangement in question leads

12 unquestionably to the conclusion that it will have an anticompetitive effect on consumers and

13 markets. *Cal. Dental Ass'n*, 526 U.S. at 770. But the allegations of the Fourth Amended

14 Complaint leave open the possibility that defendants' guarding of their Seahawks-related marks

15 and the exclusion of PBTM from the relevant market would have "no effect at all on

16 competition," making a "quick look" form of analysis inappropriate. *Id.* at 771. PBTM does not

17 allege its pre-2014 share of the market for NFL trademarked products in the Pacific Northwest,

18 nor does it provide any facts in support of its conclusory allegation that "it would have the

19 ability to deprive the [d]efendants of significant levels of business for the Products and the

20

21  _____

22  [3] In particular, PBTM alleges that defendant NFL Properties "controls the licensing of
   NFL team trademarks," including those held by the Seahawks, and that the Seahawks and NFL
   Properties have conspired "to restrain trade unlawfully and unreasonably" "in the market for

23  distribution and manufacture of merchandise carrying trademarks for the teams of the National
   Football League (collectively "Products") within the Pacific Northwest (Washington and

24  Oregon)." Dkt. #47 at ¶¶ 52-53.

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 14

derivative revenues" if permitted to compete in the relevant market. Dkt. # 47 at 25. It has not

alleged that consumer choices in the market for NFL gear have been limited, that consumers are

paying higher prices, or that consumers have been forced to accept inferior goods as a result of

paragraph 22. PBTM has not provided sufficient factual allegations from which one could

conclude "in a twinkling of an eye" that defendants' actions – which target only PBTM's use of

the VOLUME 12 and V12 marks - have any anticompetitive impact on customers or markets.

*NCAA*, 468 U.S. at 109 n. 39 (quoting Phillip Areeda, *The "Rule of Reason" in Antitrust*

*Analysis: General Issues* 37–38 (Federal Judicial Center, June 1981)); *see Les Shockley Racing,*

*Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) ("[R]emoval of one or a few

competitors need not equate with injury to competition."). Allegations of harm to PBTM's own

financial and business interests, standing alone, do not raise a plausible inference that the

LEGION OF BOOM Agreement adversely affects competition in the market defined in the

Fourth Amended Complaint.[4] PBTM has therefore failed to allege sufficient facts to support a

"quick look" analysis of its Section 1 claims.[5]

---

[4] PBTM argues that Fed. R. Civ. P. 12(g) precludes defendants from challenging the adequacy of its antitrust injury allegations because they failed to raise the issue in their previous motion to dismiss.  Dkt. #51 at 20-21. *See SE Ent. Corp. v. Longarzo*, No. CV 17-9132-MWF (JCX), 2018 WL 5298692, at *4 (C.D. Cal. Apr. 16, 2018); 5D C. Wright & A. Miller *Federal Practice & Procedure* § 1385, Application of Rule 12(g) – In General (3d ed. 2017) (Rule 12(g) "generally precludes" a Rule 12 objection that could have been raised but was not). The Fourth Amended Complaint redefines the relevant market, however, materially changing the evaluation of consumer harm and anticompetitive effect. The motion to dismiss the new pleading was the first opportunity to challenge the adequacy of these allegations. Regardless, defendants raised the lack of consumer harm in their previous motion to dismiss. *See* Dkt. #30 at 25-26 (arguing that PBTM's allegations of consumer harm were "cursory" and failed to state a plausible claim that the licensing agreement injured competition). Rule 12(g) does not bar defendants' challenge to the allegations of consumer harm.

[5] Under that analytical framework, a claim of anticompetitive effects will shift the burden to the defendant to show empirical evidence of procompetitive or neutral effects only where the

1    Turning to PBTM's monopoly claims, Section 2 of the Sherman Act provides that

2 "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with

3 any other person or persons, to monopolize any part of the trade or commerce among the

4 several States, or with foreign nations . . . [commits a felony]." 15 U.S.C. § 2. To state a claim

5 for monopolization under this provision, a plaintiff must allege that the defendant (1) possessed

6 monopoly power in the relevant markets; (2) willfully acquired or maintained its monopoly

7 power through exclusionary conduct; and (3) caused antitrust injury. *Am. Prof'l Testing Serv.,*

8 *Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1151 (9th

9 Cir. 1997). To state a claim for attempted monopolization, a plaintiff must allege (1) specific

10 intent to control process or destroy competition; (2) predatory or anticompetitive conduct

11 directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly

12 power" and (4) causal antitrust injury. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–

13 1433 (9th Cir. 1995). To adequately allege antitrust injury – which is an element of both

14 monopolization and attempted monopolization – a plaintiff must raise a plausible inference

15 "that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it

16 is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt

17 competition. *Id.* at 1433. For the reasons discussed above,  PBTM has failed to adequately

18 allege anticompetitive effects on consumers and the market, rather than simply injuries to its

19 own business interests. *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051,

20 1055 (9th Cir. 1999) ("[T]he antitrust laws are only intended to preserve competition *for the*

21

22 _____

23 Court has the information necessary to "properly identif[y] the theoretical basis for the
anticompetitive effects and [can] consider[] whether the effects actually are anticompetitive.
Where, as here, the circumstances of the restriction are somewhat complex, assumption alone

24 will not do." *Cal. Dental Ass'n*, 526 U.S. at 775 (1999).

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 16

1    *benefit of consumers*.") (emphasis added)). PBTM alleges that defendants' conduct –

2    specifically, their refusal to authorize PBTM to use its mark in connection with the Seahawks –

3    forced PBTM to cease sales of VOLUME 12 and V12 products, thus damaging PBTM through

4    lost sales. *See* Dkt. #47 at ¶¶ 63-64. Notwithstanding the fact that defendants' conduct caused

5    specific injury to PBTM, PBTM has failed to sufficiently plead that it affected competition in

6    the relevant market as a whole. Accordingly, it has failed to state a plausible Section 2 claim for

7    monopolization or attempted monopolization.

8        **D.  Trademark Infringement (Count 8)**

9        To establish a claim for trademark infringement, a plaintiff must allege facts showing

10   "(1) that it has a protectible [sic] ownership interest in the mark; and (2) that the defendant's use

11   of the mark is likely to cause consumer confusion, thereby infringing upon [the plaintiff's]

12   rights to the mark." *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*,

13   744 F.3d 595, 599 (9th Cir. 2014) (quoting *Dep't of Parks & Recreation for State of Cal. v.*

14   *Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)). To determine whether a

15   likelihood of confusion exists, Courts consider eight factors: (1) the "similarity of the marks;"

16   (2) the "strength of the mark" that has allegedly been infringed; (3) "evidence of actual

17   confusion;" (4) the relatedness or "proximity" of the goods; (5) the "normal marketing

18   channels" used by both parties; (6) the "type of goods and the degree of care likely to be

19   exercised by the purchaser;" (7) the alleged infringer's "intent in selecting the mark;" and

20   (8) evidence that "either party may expand his business to compete with the other." *AMF Inc. v.*

21   *Sleekcraft Boats*, 599 F.2d 341, 348–54 (9th Cir. 1979). Courts apply the *Sleekcraft* factors

22   flexibly depending on the facts of the case, and every factor need not be satisfied. *Survivor*

23   *Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005); *see also Stone Creek, Inc. v.*

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 17

1 | *Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017) ("Not all factors are created

2 | equal, and their relative weight varies based on the context of a particular case.").

3 | PBTM claims that defendants' use of the number "12" infringes on PBTM's federally

4 | registered V12 marks. Dkt. #47 at ¶¶ 100-108. As an initial matter, it is undisputed that the 2011

5 | agreement assigned PBTM's rights in the use of its marks to the Seahawks. *See id.* at ¶ 29 ("The

6 | Seahawks and PBTM entered into a license agreement on June 7, 2011 . . . that gave the

7 | Seahawks the exclusive right to use VOLUME 12 on stationary, signage, video boards and LED

8 | within the Stadium . . . ."). A licensor may maintain an action for trademark infringement

9 | against a licensee, but that requires that the licensee's conduct "fall[] *outside* the scope of the

10 | license." *Audigier Brand Mgmt. v. Perez*, No. CV 12-5687-CAS RZX, 2012 WL 5470888, at *7

11 | (C.D. Cal. Nov. 5, 2012) (emphasis in original). Here, the Fourth Amended Complaint makes

12 | no effort to identify what specific products allegedly infringe on PBTM's trademarks. As a

13 | result, PBTM has not plausibly stated a claim that defendants' use of the mark is likely to cause

14 | consumer confusion, let alone whether such use falls outside the scope of the license. PBTM

15 | has failed to allege facts sufficient to establish a plausible claim for trademark infringement.

16 | **E.  Rescission of 2011 Agreement (Count 9)**

17 | PBTM seeks recission of the 2011 Agreement on the ground that Judge Martinez "ruled

18 | that the LEGION OF BOOM Agreement superseded the 2011 Agreement." Dkt. #47 at ¶¶ 110.

19 | PBTM's reading of the prior order is incorrect. The order addressed only the provisions of the

20 | 2011 Agreement granting PBTM an unfettered "opportunity to capitalize on the publicity

21 | created by the Seahawks use of the Mark" and allowing PBTM to "retain all of the rights to the

22 | Mark not granted in this Agreement."  Dkt. #46 at 15-16 (quoting Dkt. #26 at ¶¶ 84-85)). Judge

23 | Martinez concluded that to the extent PBTM alleged that the terms of the 2014 LEGION OF

24 |

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 18

1    BOOM Agreement breached those terms of the 2011 Agreement, well-established principles of

2    contract law dictate that a later contract between the same parties supersedes conflicting

3    provisions in an earlier contract. *Id.* Judge Martinez did not consider whether the 2011

4    Agreement had been rescinded *in toto*, nor can the prior order reasonably be construed as

5    PBTM urges. The prior order does not, therefore, provide a basis for recission.

6         Under Washington law, a party seeking rescission of a contract "must act with

7    reasonable promptness, and where a delay reveals an intent to waive a right to rescind, the

8    contract is valid and binding." *Claxton v. Bowes*, No. 12-CV-0492-TOR, 2013 WL 1290806, at

9    *4 (E.D. Wash. Mar. 26, 2013) (citing *Ferguson v. Jeanes*, 27 Wash. App. 558 (1980)). PBTM

10   filed this lawsuit in December 2019, more than eight years after the 2011 Agreement was signed

11   and more than five years after the 2014 Agreement was signed. The original complaint did not

12   seek rescission. It was not until the Third Amended Complaint was filed in June 2020 that the

13   validity of the 2011 Agreement became an issue: at the time, PBTM sought to enforce, rather

14   than rescind, its terms. *See, e.g.*, Dkt. #26 at ¶¶ 83-87. Affirmance of a contract bars a

15   subsequent rescission. *Johnson v. Brado*, 56 Wn. App. 163, 167 (1989), as amended on

16   reconsideration (Jan. 23, 1990). PBTM's failure to seek rescission with "reasonable

17   promptness" and its efforts to enforce the contract suggest an intent to waive the right to

18   rescission.

19        Finally, rescission is an equitable remedy. "On the principle that he who seeks equity

20   must do equity, it is the general rule that one who demands rescission of a contract of purchase

21   to which he is a party must restore or offer to restore to the other party whatever he may have

22   received under the contract in the way of money, property, or other consideration or benefit."

23   *Hopper v. Williams*, 27 Wn.2d 579, 587 (1947). There is no indication that PBTM has returned

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 19

1    or offered to return the benefits it obtained under the 2011 Agreement. PBTM agreed to license

2    its VOLUME 12 mark to the Seahawks in exchange for the "opportunity to capitalize on the

3    publicity created by the Seahawks use of the Mark." Dkt. #47 at ¶ 29. Although the 2014

4    LEGION OF BOOM Agreement ultimately superseded that provision, PBTM presumably

5    exploited its opportunities from 2011 to 2014 and retained the resulting benefits. It cannot now

6    seek rescission because a subsequent contract reduced the benefits of the 2011 bargain.

7    **F.  Declaratory Relief (Counts 1-2)**

8           PBTM seeks declaratory relief with respect to its right to register trademarks before the

9    USPTO and cancellation of the Seahawks' competing trademarks. Specifically, Count 1 seeks

10   declarations that (1) PBTM is the owner of six "12" trademarks, (2) defendants' oppositions to

11   registration of those trademarks are barred by the doctrines of prior registration, estoppel by

12   acquiescence, estoppel by laches, estoppel by license, and unclean hands, (3) registration of the

13   six trademarks will not infringe upon or cause dilution of defendants' marks, and (4) PBTM is

14   entitled to issuance of the six trademarks by the USPTO. Dkt. #47 at ¶¶ 66-70. Count 2 seeks a

15   declaration that five trademarks owned by the Seahawks be cancelled for various reasons. Dkt.

16   #47 at ¶¶ 73-74. Defendants move to dismiss both claims for lack of subject matter jurisdiction.

17          On a Rule 12(b)(1) motion to dismiss, the burden is on the plaintiff to establish subject

18   matter jurisdiction. *Kokkonen*, 511 U.S. at 377. Under the Declaratory Judgment Act, a dispute

19   must present a "case of actual controversy" for a court to have subject matter jurisdiction. 28

20   U.S.C. § 2201(a). Subject matter jurisdiction exists if "the facts alleged, under all the

21   circumstances, show that there is a substantial controversy, between parties having adverse legal

22   interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

23   *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Maryland Cas. Co. v.*

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 20

1    *Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). In an action for a declaratory judgment that a

2    trademark is invalid or that a plaintiff is not infringing, courts consider whether the plaintiff has

3    a "real and reasonable apprehension that he will be subject to liability if he continues to

4    manufacture his product." *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007)

5    (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555–56 (9th

6    Cir. 1990)). "In applying this standard, we focused upon the position and perceptions of the

7    plaintiff, declining to identify specific acts or intentions of the defendant that would

8    automatically constitute a threat of litigation. The acts of the defendant were instead to be

9    examined in view of their likely impact on competition and the risks imposed upon the plaintiff,

10   to determine if the threat perceived by the plaintiff were real and reasonable." *Chesebrough–*

11   *Pond's, Inc. v. Faberge, Inc.,* 666 F.2d 393, 396 (9th Cir. 1982).

12         Here, PBTM claims that it has a reasonable apprehension of litigation based on

13   correspondence from defendants' counsel in 2016 and defendants' opposition to PBTM's

14   efforts to register new 12-related marks. Dkt. #47 at ¶¶ 14-21. The 2016 correspondence

15   involved marks other than those about which PBTM seeks declaratory relief, but it makes clear

16   that the Seahawks view the use of any mark comprising, consisting of, or containing a "12" to

17   be an infringement of defendants' intellectual property rights. Dkt. #47 at ¶ 14.[6] Although

18

19   _____

20         [6] The December 2016 letter from NFLP's counsel stated, "We firmly believe that any
     use of these marks without the permission of the Seahawks Club would violate the Legion of
21   Boom Agreement, *in addition to constituting infringement of the Seahawks Marks* . . . ." *Id.* at
     ¶ 14 (emphasis added). In response to PBTM's request for permission to use a "12" trademark
22   on a Seahawks-related product, counsel for the Seahawks advised PBTM: "[W]e contend that
     the application, registration and use of the PBTM trademarks on certain products and in certain
23   promotional materials *infringe our intellectual property rights* . . . Please be advised that we
     cannot and will not consider approving these types of requests until our outstanding issues are
24   resolved." *Id.* (emphasis added). In a follow-up letter dated August 31, 2016, counsel stated:

1    defendants' assertion that they would take "all steps necessary" to protect their intellectual

2    property rights was made three years before PBTM filed this lawsuit, those assurances plus the

3    nature of defendants' opposition to PBTM's pending registration applications justify PBTM's

4    apprehension that it will have to defend an infringement lawsuit unless it abandons the new

5    marks.

6            "[A] simple opposition proceeding in the Patent and Trademark Office generally will not

7    raise a real and reasonable apprehension of suit." *Chesebrough-Pond's*, 666 F.2d at 396.

8    However, jurisdiction over a declaratory judgment action may lie based solely on TTAB

9    materials "where the defendant's opposition articulates the *prima facie* elements of trademark

10   infringement." *Id.* The oppositions filed with the TTAB state that defendants have used versions

11   of the mark "12" long before PBTM filed its intent-to-use applications, that defendants' rights in

12   the mark are exclusive, that they used the marks extensively, in a broad geographic area, and in

13   numerous channels of trade, and that PBTM's mark is so similar to defendants that it is likely to

14   cause confusion. *See, e.g.*, Dkt. #26-1 at 2-8. The "likelihood of confusion" standard is relevant

15   to both registration and infringement proceedings and, as was the case in *Chesebrough-Pond's*, it

16   was reasonable for PBTM to infer a threat of an infringement action if PBTM persists.

17

18

---

19           [Y]our assertion in the August 11th Letter that PBTM LLC or its affiliates intend
             to design, produce, advertise, distribute and/or sell products featuring a 12 would
20           obviously be in violation of Paragraph 22 of the Legion of Boom Agreement and
             demonstrates PBTM's *bad faith intent to violate the Seahawks intellectual property*
21           *rights* and/or misappropriate the goodwill inherent in the 12 Marks. Accordingly,
             be advised that Football Northwest will take *all steps necessary* to protect its
22           contractual rights and its valuable intellectual property rights.

23   *Id.* (emphasis added).

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 22

1    Defendants argue that, because PBTM is not currently utilizing any of its 12-related

2    marks at the moment, there can be no danger of litigation. PBTM has filed an intent-to-use

3    application, however, and it is not be required to develop production capabilities and begin

4    distribution of 12-related merchandise (with the attendant risk of infringement) before seeking a

5    declaration of its rights. Defendants have not disclaimed an intent to pursue an infringement

6    action if PBTM uses the 12-related marks at issue, and the long-running business relationship

7    between the parties suggests that such litigation is on the horizon. "Failure of this court to

8    resolve the dispute would force [PBTM] to choose between continuing to forego competition in

9    this quickly expanding market, and entering the market, risking substantial future damages and

10   harm to relationships with its customers and retailers." *Chesebrough-Pond's*, 666 F.2d at 397.

11   There is an actual controversy over which the Court can exercise jurisdiction.[7]

12   **G.  Leave to Amend**

13   Where a complaint is dismissed for failure to state a claim, "leave to amend should be

14   granted unless the court determines that the allegation of other facts consistent with the

15   challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well*

16   *Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).  Plaintiff's declaratory judgment claims

17   have survived this motion to dismiss, and the litigation continues. In this context, leave to

18   amend will not be blindly granted. If PBTM believes it can, consistent with its Rule 11

19   obligations, amend its claims to remedy the pleading and legal deficiencies identified above, it

20   may file a motion to amend and attach a proposed pleading for the Court's consideration.

21

22         [7] Interspersed in defendants' case and controversy argument is the suggestion that the
     Court should abstain from hearing the dispute in favor of the administrative process before the
23   USPTO. Dkt. #48 at 22; Dkt. # 49 at 13. The few cases cited are not persuasive in this context: if
     a stay pending resolution of the administrative proceedings is appropriate, defendants may raise
24   that issue in a separate motion.

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 23

1

### III.   CONCLUSION

2        For all of the foregoing reasons, defendants' motions to dismiss (Dkts. #48 and #49) are

3   GRANTED in part. Counts 3 (breach of the duty of good faith and fair dealing), 4-7 (antitrust),

4   8 (trademark infringement), and 9 (rescission) are hereby DISMISSED.

5

6        Dated this 7th day of March, 2022.

7

8                                    *Robert S. Lasnik*
                                     Robert S. Lasnik
9                                    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER GRANTING IN PART
 DEFENDANTS' MOTIONS TO DISMISS - 24